MAURICE W. GROBER, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. HERMAN KAHN, GERTRUDE KAHN, ALICE BROOKS AND CAROL WEINTRAUB, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.

Argued January 25, 1966—Decided May 2, 1966.

*Mr. Walter D. Van Riper* argued the cause for defendants-appellants and cross-respondents (*Mr. Van Riper* and *Mr. Charles E. Villanueva,* of counsel; *Messrs. Van Riper and Belmont,* attorneys).

*Mr. Israel B. Greene* argued the cause for plaintiff-respondent and cross-appellant (*Mr. Greene* and *Mr. Laurence B. Orloff,* on the brief; *Mr. Greene,* attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J.  The question is whether plaintiff is entitled to counsel fees and expenses incurred in proving his case. The trial court held our rule of court did not authorize an allowance. *Grober v. Kahn,* 83 *N. J. Super.* 382 (*Ch. Div.* 1964). The Appellate Division, holding there was power to make an award, remanded the matter to the trial court for reconsideration in that light. 88 *N. J. Super.* 343 (*App. Div.* 1965). We granted cross-petitions for certification. 45 *N. J.* 596 (1965).

## I.

Plaintiff Grober was an officer of a corporation, Condenser Service & Engineering Co., Inc. (herein Condenser), controlled by defendant Kahn. A New York attorney who had represented Condenser before Kahn acquired it and had become friendly with Grober, brought to Grober's attention

a business opportunity involving Camden Forge Company (herein Camden Forge), also represented by that attorney. Grober laid the proposal before Kahn. The transaction which emerged involved (1) the purchase by Condenser of the merchandise inventory and raw material of Camden Forge at 60% of its book value of $1,000,000; (2) completion by Condenser of work in progress, as to which Camden Forge would receive 50% of the profits; and (3) purchase by defendant Kahn of remaining tangibles, real and personal, of Camden Forge for $500,000.

This controversy arises out of the third aspect of the transaction, the acquisition by Kahn of the remaining assets of Camden Forge. As to that matter, a written agreement was executed by Grober and Kahn, which, after reciting that Kahn had acquired those assets from Camden Forge for $500,000, $495,000 of which Kahn had borrowed from another corporation wholly owned by him, provided that in consideration of $1,250 paid by Grober, a like sum paid by Kahn's wife, and $675 paid by each of Kahn's two daughters, Kahn assigned and transferred to Grober and Mrs. Kahn 25% each and to Kahn's daughters 12½% each of Kahn's right, title and interest in those assets. Kahn retained the sole power of disposition. The contract called for Kahn to liquidate all the real and personal property and to disburse the net proceeds in accordance with the percentage interests just stated.

Grober brought the present action against all of the Kahns, seeking dissolution of this "joint venture," as he labels it, and an accounting and the payment to him of his share of the net proceeds. Kahn denied the writing held by Grober was the true agreement. Much of the trial involved that controversy, and as to it Grober prevailed. Part of the trial concerned Grober's allegation that Mrs. Kahn and the daughters were mere fronts for Kahn. The significance of that allegation is not apparent to us but in any event Kahn and his family prevailed on that allegation. Finally the trial concerned the accounting phase, as to which the trial court

found that Kahn was chargeable with net receipts (after the payment of the $495,000 loan mentioned above and other expenses of liquidation) of $431,400.60, and with interest thereon for a total of $506,572.81. Each of the daughters was found liable jointly with Kahn for $3,000 received from him. The trial court found that $250,000 of the principal figure had been loaned to Condenser with Grober's actual consent. The balance of $181,400.60, which is less than Grober claimed, represents the additional sums the trial court found Kahn had received from the sale of assets but had not accounted for.

Grober's interest in the sum of $506,572.81 just mentioned is 25% thereof, against which quarter interest Kahn was adjudged entitled to a credit of $39,080.43, arising out of a payment made by Kahn to Internal Revenue on Grober's account. Nonetheless Grober sought out of the "fund" a counsel fee of $100,000, accountant's fee of $40,000, and allowance for the fees paid to appraisers whom he employed in the prosecution of the case. In denying an allowance the trial court said (83 *N. J. Super.*, at *pp.* 386–387) :

"Plaintiff urges that this proceeding is a class action. Disregarding form and looking to the substance of the instant litigation, it is apparent that plaintiff actively engaged in an action directed mainly against defendant Herman Kahn and incidentally against Kahn's wife and two daughters. Plaintiff basically sought a determination of his interest in the joint venture and an accounting from the managing fiduciary, Herman Kahn, for funds of the joint venture allegedly misappropriated. The complaint sought to defeat the rights of Kahn's wife and two daughters. Plaintiff unsuccessfully urged that they were 'fronts' for Herman Kahn, with no genuine interest in the joint venture. Obviously, plaintiff's litigation was not designed to benefit any of the defendants. As I noted in my opinion in this case, dated February 21, 1964:

'It is further observed, as one would naturally expect, that Mrs. Kahn and the two daughters have joined in the defense with Kahn and apparently acquiesced in his handling of their interest in the joint venture. Hence for all practical purposes the Kahn family presents a united 75% interest opposed to the claims of plaintiff.'

The services rendered by plaintiff's counsel were to advance the claims of his client and no one else. There can be no clearer case of an adversary proceeding."

The trial court deemed controlling our decision in *Sunset Beach Amusement Corporation v. Belk,* 33 *N. J.* 162 (1960). The Appellate Division thought the situation came within *Sarner v. Sarner,* 38 *N. J.* 463 (1962), and on that basis held there was a "fund in court" within the meaning of *R. R.* 4:55-7 which reads in part:

"No fee for legal services shall be allowed in the taxed costs or otherwise, except:

\*  \*  \*  \*  \*  \*  \*  \*

(b) Out of a fund in court. The court in its discretion may make an allowance out of such a fund, but no allowance shall be made as to issues triable of right by a jury. \* \* \*"

Although on that premise the Appellate Division remanded the matter for reconsideration, it made it plain that the trial court might, in the exercise of its discretion, again deny an allowance, saying (88 *N. J. Super.,* at *p.* 358) :

"In holding that the trial court *could* have allowed a counsel fee to plaintiff's attorney, we wish to make it clear that we are not deciding that a counsel fee *should* have been awarded, or that plaintiff's attorney is entitled as of right, under the circumstances of this case, to a counsel fee. Where the case is one involving a 'fund in court,' the allowance of a counsel fee rests within the 'discretion' of the court. *R. R.* 4:55-7(b). For aught we know, the trial court, upon a reconsideration of the application for counsel fees in the light of our opinion, may in its discretion and for valid reasons decide that no counsel fee should be allowed plaintiff's attorney. The opinion of the trial court on the main issue portrayed plaintiff, as well as defendant Kahn, as unworthy individuals, each with unclean hands. If the trial court in its discretion does allow plaintiff's attorney a counsel fee, the *quantum* thereof is for the trial court to fix."

So also with respect to fees paid by Grober to his accountant and appraisers, the Appellate Division said that "Here, too, the trial court may \* \* \* very well adhere to its previous exercise of discretion and, perhaps, for good reason deny again plaintiff's application for payment \* \* \*." (88 *N. J. Super.,* at *p.* 359.)

Plaintiff contends the Appellate Division should have held a proper exercise of discretion requires allowances to be made. He complains also of the statement by the Appellate Division

that plaintiff's "unclean hands" would be a proper consideration. Basic to plaintiff's position is the claim that this litigation conferred a "benefit" upon Kahn and his family; that this being so, they should share the cost of that "benefit"; and that their enjoyment of the benefit is no less because of his, Grober's, "unclean hands."

But the claim that Grober enriched the Kahns by this suit against them rests in fantasy. The claim is dispelled on the face of the complaint itself. Drawn with an eye toward allowances, the complaint asked that Grober have "his reasonable costs, expenses, including accountants' fees, and counsel fees to be paid by the defendant, Herman Kahn, or out of his share of the trust property, or out of the fund in court." To that end the first paragraph alleged that Grober "brings this action for and on behalf of himself and all others similarly situated, having an interest in the joint venture hereinafter described." Who are those "others"? Kahn could hardly be among the beneficiaries of the suit against him. The only "others" who could be similarly situated would be Mrs. Kahn and the daughters, but as to them the complaint proceeded to charge that they were merely fronts for Kahn and prayed a judgment to that effect as well as the recovery of moneys from the daughters. That left Grober as the sole party in interest in the prosecution of the action, as the trial court accurately held. And the trial court also having found that, notwithstanding he came out on top on the record of the trial, Grober does not, as a suitor, rank above the man he bested, it is understandable that Grober would anticipate that if the remand to the trial court does no more than commit the subject to its discretion, the remand is no victory at all. At any rate, for the reasons which follow, we are satisfied the trial court correctly held our rule of court does not authorize allowances.

## II.

Prior to the *Constitution of* 1947, the former Court of Chancery in its discretion could award counsel fees in any

cause. *R. S.* 2:29–131. Our rule of court rejected that approach. As we said in *Sunset Beach Amusement Corp. v. Belk, supra,* 33 *N. J.,* at *p.* 167 :

"*R. R.* 4:55–7 provides that no fee for legal services shall be allowed in the taxed costs or otherwise except in the situations set forth in that rule. This rule constituted a policy decision to break with the practice of the former Court of Chancery which authorized counsel fees to the victor in the ordinary adversary proceeding. See *State v. Otis Elevator Co.,* 12 *N. J.* 1, 10 (1953). That practice had never obtained in the courts of law. In actual operation it proved unduly onerous upon litigants and spawned charges of favoritism. Although the sanction of counsel fees against a plaintiff who sues or a defendant who defends in manifest bad faith has much to commend it, yet the problem of confining allowances to precisely that situation in actual practice would be a formidable one. At any rate, the rule of court adopted the policy that except in the situations within its terms each litigant shall bear the expenses of prosecuting and defending his individual interests. *State v. Otis Elevator Co., supra* (12 *N. J.,* at *p.* 10 and at *pp.* 26–27 (dissenting opinion) ) ; *Janovsky v. American Motorists Insurance Co.,* 11 *N. J.* 1, 7 (1952)."

Indeed when the Legislature passed a bill which sought to overturn the approach of our rule of court, Governor Driscoll vetoed the measure, saying it "would revive an unhappy practice that has been generally repudiated." See dissenting opinion, *State v. Otis Elevator Co.,* 12 *N. J.* 1, 27 (1953).

Of course, there are situations in which the wrong done, or the defense made, is so provoking that the offender could justly be saddled with the costs of the other side. But, for the reason given in the quotation above, our rule made no exception for such a case. Indeed, this became evident shortly after the rule was promulgated when the Court had before it the kind of a situation in which, under a different policy, an allowance would be fitting. The case was *Liberty Title & Trust Co. v. Plews,* 6 *N. J.* 28 (1950). It involved an express trust and a paid fiduciary. The proofs were found to "demonstrate conclusively that the trustee was guilty of self-interest, self-dealing, private profit-taking and flagrant mismanagement prior to the time of the intermediate account, all of which it successfully concealed from the court and the

exceptants" (at *p.* 37). Nonetheless our rule of court was held not to authorize an assessment of counsel fees against the trustee. And our Court added that "It was not contemplated that the rule would or could be completely dispensed with in individual cases * * *." (at *p.* 44.)

As we have noted, the trial court deemed *Sunset Beach Amusement Corp. v. Belk, supra,* 33 *N. J.* 162, to control this case in principle. We there said (33 *N. J.,* at *pp.* 168–169):

" 'Fund in court' is not too happy a term. It is a shorthand expression intended to embrace certain situations in which equitably allowances should be made and can be made consistently with the policy of the rule that each litigant shall bear his own costs. The difficulty with the term is that literally it may connote a fund within the precincts of the court in a physical or geographic sense whereas 'in court' refers to the jurisdictional authority of the court to deal with the subject matter. * * * And for that matter, the existence of power in the court to control the subject matter is not itself enough to demonstrate the existence of a 'fund in court' within the purpose of the rule. *Haines v. Burlington County Bridge Comm.,* 9 *N. J.* 539, 542 (1952).

\* \* \* \* \* \* \* \*

In general, allowances are payable from a 'fund' when it would be unfair to saddle the full cost upon the litigant for the reason that the litigant is doing more than merely advancing his own interests. Thus, for example, when there are classes of claimants to the fund and the services redound to the benefit of others as well, it is fair that all contribute to the cost by a charge against the subject matter. * * * Typical is a controversy among stockholders with respect to dividend rights in the surplus of a corporation. * * * .

\* \* \* \* \* \* \* \*

Where the litigant creates a fund which will benefit others, again it is just that the fund be charged. Included are actions by a stockholder on behalf of the corporation to recover assets diverted or withheld from it."

In an effort to demonstrate a benefit upon Kahn and his family and thus come within the foregoing thesis, Grober refers to *Sarner v. Sarner, supra,* 38 *N. J.* 463. Sarner involved (1) corporate derivative claims asserted by two minority stockholders against the majority stockholder to recover diverted assets; and (2) further claims by the same

individual plaintiffs against the same defendant to the effect that they were his partners in a management enterprise and entitled as such to receive shares of profits. Plaintiffs prevailed both as to the corporate claims and as to the partnership action. They were allowed a counsel fee payable by the corporations, but were not allowed a counsel fee either from the partnership assets or against the defendant partner. Defendant appealed, claiming (1) there should be no allowances against the corporations because the litigants were the sole stockholders and for that reason the suits ought to be deemed to have been brought solely to advance plaintiffs' own interests within the principle stated in *Sunset Beach;* and (2) that since the allowances against the corporations were based on an affidavit of services which included services in furtherance of the partnership claims, the trial court apparently took those services into account in making the allowances against the corporations. We held allowances were properly made with respect to the corporate actions but remanded the matter to the end that there be deleted so much of the allowances, if any, as reflected services rendered in the partnership suits.

In *Sarner* each plaintiff held 10% of the stock of each corporation and the defendant, their brother, held the remaining 80%. Defendant argued that plaintiffs should be deemed to be furthering only their own interests because beneath the corporate surface were but three contending co-owners. To that end defendant cited *Tefft v. Schaefer,* 136 *Wash.* 302, 239 *P.* 837 *(Sup. Ct.* 1925), which did take that view of a similar scene. We however declined so to hold for it seemed to us that it would be unjust to ignore the corporate form. The corporations were realities, in law and in economic fact. Plaintiffs could not have sued on their own account and could not have obtained judgments for their own interests alone. They could not have done so directly, nor, holding but minority interests, could they have readily done so indirectly by way of dissolution of the corporations. The sums recovered against defendant had to go to the corporate

treasuries. Indeed, plaintiffs were entitled to have the moneys returned to those treasuries, to work for the aggrandizement of their investment. Moreover adverse corporate experience might consume the money restored by the litigation so that plaintiffs would ultimately receive nothing. Hence, to require the corporations to pay the same fees they would have paid if they had brought the suits was merely to pass the cost of the corporate litigation to those who will someday receive the benefit of the corporate recovery. For those reasons we were satisfied that whether the stockholders be many or few, it would be fiction to deny the corporate fact.

But as to the partnership litigation, the opinion in *Sarner* moved on the premise that the action for accounting between partners was just an ordinary suit by a litigant to advance his own interest. Plaintiffs contended they were partners and defendant said they were not. Plaintiffs won, and defendant had to account to each for his 10% share of the profits. No one so much as suggested that the defendant should be compelled to bring into court all of the profits, then to be "enriched" upon the return of 80% less a counsel fee upon it. Rather the judgment required defendant to pay plaintiffs the percentages due them, and the matter was remanded because there was the possibility that plaintiffs, entitled to no allowance in the partnership suit, had inadvertently been granted one in the allowances against the corporations.

That view of a suit between partners squared with earlier decisions under our rule of court. *Midler v. Heinowitz,* 6 *N. J. Super,* 359 (*App. Div.* 1950), involved an accounting action between partners (the opinion speaks interchangeably of a "joint venture" and a "partnership venture"). There, as here, the defendant partner was found guilty of fraudulent diversion of assets and failure to account. Counsel fees were denied. Plaintiff sought to avoid our rule of court on the ground that the suit was started in the former Court of Chancery at a time when counsel fees could be awarded the victor in the discretion of the court under *R. S.* 2:29–131. The Appellate Division noted our holding in *John S. Wester-*

*velt's Sons v. Regency, Inc.,* 3 *N. J.* 472 (1950), that our rule of court superseded that statute and concluded that our rule barred allowances in favor of the prevailing partner. The judgment of the Appellate Division was affirmed, without mention, however, of the issue of counsel fees. 10 *N. J.* 123 (1952). See also, *Long v. Mertz,* 21 *N. J. Super.* 401 (*App. Div.* 1952); *Blut v. Kalz,* 36 *N. J. Super.* 185 (*App. Div.* 1955); *Schmerer v. Estate of Marcus Kirschenbaum,* 39 *N. J. Super.* 475 (*App. Div.* 1956), which, although the factual patterns were not like the one before us, nonetheless proceeded on the premise that an accounting action between partners did not involve a fund in court.

It is true that a partnership is for some purposes an entity separate and apart from the partners, but, as we pointed out in *Mazzuchelli v. Silberberg,* 29 *N. J.* 15 (1959), the entity concept, which exists to further a just result, cannot be invoked to achieve an unjust one. There we would not permit a partnership employee, entitled to workmen's compensation benefits, to sue a partner as a negligent third party, for to do so would conflict with the policy of the compensation statute. So here, the entity concept cannot be invoked merely to defeat the policy of our rule of court that each litigant bear his own costs. Where a partner is free to sue on his own account and to get what is due him by a judgment in his own favor, the action is not for the benefit of those who oppose him and we see no reason, consistent with the policy of our rule of court, to pretend that it is. Grober cites *Tevander v. Ruysdael,* 299 *F.* 746 (7 *Cir.* 1924), which does run against our partnership cases. On the other hand, *Shulkin v. Shulkin,* 301 *Mass.* 184, 16 *N. E. 2d* 644, 118 *A. L. R.* 629 (*Sup. Jud. Ct.* 1938), accords with our view. There is of course an arguable policy issue, but the question before us turns upon our rule of court and the policy it embraced.

Thus far we have talked in terms of a general partnership, although admittedly this case does not involve a partnership. We have discussed the impact of our rule upon litigation

between partners because Grober claims there is a "joint adventure" before us and that in dealing with it we should draw upon principles relating to a partnership.

Joint Adventure is an amorphous concept. In a general way it is a business venture more limited in its objective than a partnership. See *Crane, Partnership* (*2d ed.* 1952), *p.* 159; 30 *Am. Jur., Joint Adventures,* § 2, *p.* 939. Whether the arrangement before us should so be labeled is debatable but really of no moment, because the ultimate question is whether on the total facts there is anything more than a suit by one man against another.

The agreement does not purport to create a business venture. Rather the thesis is ownership in common of specific assets with authority in Kahn alone to sell them. It recites that Kahn had agreed to purchase real and personal property from Camden Forge and had acquired title thereto by deed and bill of sale for $500,000, and that, in consideration of the payments to Kahn of $1,250 each by Grober and Mrs. Kahn and of $675 by each of the daughters, "Kahn hereby assigns and transfers" to them the percentages already mentioned "of his right, title and interest in and to the real estate, equipment, machinery and other personal property purchased by him." It continues that "Kahn reserves unto himself, however, the right, power and authority to sell or lease in his name" any or all the properties by *bona fide* sale or lease at the best terms offered to him. The parties agree "the terms of this agreement shall not constitute, or be in any wise considered, a lien upon the properties or premises," and that the agreement shall become null and void as to any participant who places it on record. Kahn agrees to "distribute to the Participants, in the percentages of their interest, the net profits realized by such sale and liquidation," distribution "to be made immediately after liquidation to cash of the real estate and substantially all of the machinery, equipment and other personal property."

Thus there is no business to be conducted;[1] there is no mutual agency to incur obligations; there is no managerial voice whatever in Grober or in Kahn's wife or the daughters; there is no agreement to share losses, Kahn alone running the risk with respect to $495,000 borrowed by him from his wholly owned corporation to enable him to pay $500,000 to Camden Forge. The arrangement is simply one for a common ownership with sale as the objective and with Kahn holding the exclusive power of disposition.

As we have said, it is not important what tag we place on this economic arrangement. The question is whether the arrangement should be personified, whether we should find there is an entity, separate from the contracting parties, and say that the entity holds the title notwithstanding the agreement provides that the parties have it, and that although the agreement says Kahn shall liquidate the assets and pay the others their respective shares upon promises running directly to them, nonetheless Kahn can respond only to that entity and Grober can claim only through it. We see no reason thus to complicate this transaction. Surely we ought not to do so merely to circumvent the policy of our rule of court that each litigant bear his own expense.

Much of the argument of Grober revolves about the proposition that Kahn was a "trustee" and the obligation he violated was "fiduciary."

The solution of the controversy is not advanced by resorting to the concept of a trust. Actually the agreement does not purport to create one. The Appellate Division thought there was a "resulting trust," we assume with respect to Grober's interest in the properties. But whether there was

---

[1] This statement seems accurate notwithstanding the finding below that Kahn, on behalf of the "joint venture," undertook to perform a "servicing" agreement between Camden Forge and the Navy Department with respect to Navy property on the premises of Camden Forge. Condenser agreed with Kahn to do the servicing at cost, and thus without risk to the joint venture. Ultimately moneys due from the Navy were used to buy the Navy property, which property became subject to the written agreement here involved.

a trust of any kind of all the assets or of Grober's interest in them or in the proceeds of their sale, is irrelevant, for the reason that this action would nonetheless be one brought by Grober in his own interest. Hypothetically, the fact of a trust could be significant in a "fund in court" controversy if a beneficiary of the trust, because of its prescribed duration or some other reason, could not obtain a present recovery for his own economic loss and could obtain what is due him only if what was taken is restored by the defaulting co-beneficiary to the trust to be devoted to its purposes. In other words, a trust could be a jural entity, akin, within the principle of our rule relating to counsel fees, to a corporate entity. But in the case before us, even if the property or Grober's interest in it were held to be in trust, there is nothing in the terms of such a trust which would distinguish this action from a suit to enforce the explicit contractual obligation to pay a share of the net proceeds. However the action is labeled, it remains one brought by Grober for Grober.

Nor does it help to say that Kahn owed Grober a "fiduciary" obligation. Of course he did, at least as to Grober's interest. Co-owners of property, as such, have a "confidential relation" with respect to certain aspects of their common interests, *Breitman v. Jaehnal,* 99 *N. J. Eq.* 243 (*Ch.* 1926), affirmed o.b. 100 *N. J. Eq.* 559 (*E. & A.* 1927); *Hardy v. Johnson,* 12 *N. J. Super.* 268 (*Ch. Div.* 1951); *Leppert v. Leppert,* 141 *N. J. Eq.* 205 (*Ch.* 1948); 20 *Am. Jur. 2d, Cotenancy and Joint Ownership,* § 2, *p.* 93; and if Kahn's role with respect to the sale of Grober's interest is treated merely as one of agency, a "fiduciary" obligation is undeniable. *Marchitto v. Central R. Co. of New Jersey,* 9 *N. J.* 456, 466 (1952); 3 *Am. Jur. 2d, Agency,* § 199, *p.* 580. But that the obligation is of that quality is here of no significance. To begin with, Grober's claim does not depend upon the existence of an obligation of that quality, for it adds nothing to the dimensions of the expressed promise to pay a share of the profits to say the obligation is fiduciary as well as contractual. More to the present point,

to say the obligation is fiduciary as well as contractual does not change the character of the suit from one brought by Grober to further his own interests.

For that reason it does not aid in the solution of the immediate problem to talk of fraud or trust. To do so merely obscures what is otherwise a rather simple situation. There is a defensible feeling that counsel fees should be awarded in a case of fraud, and if the wrongdoer has breached as well a duty of loyalty, that feeling is intensified. But if we want to impose counsel fees in cases of fraud, we should say so, and if we want to impose counsel fees upon wayward fiduciaries, we should say so. We should not resort to a pretense that a wrongdoer who is made to account is benefited by the judgment against him.

Nor in fact would the fiction of a fund-in-court be serviceable if we were minded to impose counsel fees in cases of fraud generally or fraud of a fiduciary. It would make the size of the counsel fee depend, not upon the size of the wrong, but upon a wholly irrelevant fact, *i.e.*, the size of the wrongdoer's interest in the so-called fund. Thus, if a plaintiff holds a 5% interest in property worth $1,000,000 and the defendant holds the remainder, the counsel fee awarded upon a "recovery" of $1,000,000 would have no relation to the loss inflicted on the plaintiff, while if the culprit holds the 5% interest, the brunt of the allowances would fall upon his victim. And if the trustee—even a paid one—had no dollar stake at all in the *res,* he, upon this fictional approach to the problem, would walk away without any allowance against him, as indeed was the case in *Liberty Title & Trust Co. v. Plews, supra,* 6 N. J. 28, where we held, consonant with our present rule, that a defrauding trustee for hire was not chargeable with counsel fees. Further, upon the myth that the defendant won by losing, he would experience the same imaginary gain if the action against him were for negligence rather than fraud, and thus a fiction, generated by distaste for one factual pattern, would find application in a setting quite foreign to the initial stimulant.

As we have said, the question whether a fraud or a breach of a fiduciary obligation should warrant imposition of counsel fees is a policy issue which was resolved when our rules of court were formulated. If a change is to be made, it should be made with directness and in relevant terms. Meanwhile the policy of our rule should be honored.

## III.

At the oral argument before us it was revealed that some alleged creditors filed proofs of claim with the receiver appointed in connection with the liquidation. We were told these creditors are corporations controlled by Kahn and that the claims they assert are large.

Grober did not bring this action on behalf of creditors of the "joint venture" and we do not know whether he agrees there are any. Nonetheless, upon the disclosure before us of creditor claims, we invited attention to the question whether such creditors should contribute to the cost of Grober's victory if the assets already on hand do not suffice to pay them (after the costs of the receiver's administration have been met) and the moneys for which Kahn is here adjudged accountable will thereupon be available to them. *Cf. Sprague v. Ticonic National Bank,* 307 *U. S.* 161, 59 *S. Ct.* 777, 83 *L. Ed.* 1184 (1939).

We refrain from deciding finally what contribution, if any, should equitably be made by such creditors in that eventuality. The situation is rather odd. If Kahn really controls these creditor claims and succeeds in pressing them, he may thereby enlarge the compensation to Grober's counsel. On the other hand, if Grober contests the claims of the alleged creditors, he will reduce, and perhaps wipe out, their benefit from this action; and Grober's counsel, if Grober asks him to contest the creditors' claims, may be confronted with conflicting interests in that he may lose compensation if Grober succeeds as to the creditors.

In this complex, we should not speculate upon what equities there will be. We do no more than reserve for Grober and his counsel the question whether creditors who profit by the present litigation should be required to contribute to the cost.

The judgment of the Appellate Division with respect to allowances for counsel fees, accountant's fees and appraiser's fees is reversed and the judgment of the trial court is affirmed, subject to the reservation in part III of this opinion. No costs.

JACOBS, J. (dissenting). The result reached is not a just one nor is it compelled by any procedural rule. This was not ordinary litigation in which each litigant may fairly be expected to take care of his own expenses. It was extended litigation in which the managing fiduciary or trustee of a joint venture was found to have committed flagrant acts of fraud and misappropriation and in which the trial court directed that the misappropriated funds be restored and administered by a court-appointed receiver. That it would be inequitable to compel the defrauded coadventurer to bear all of his heavy legal costs rather than have them come, at least in some reasonable part, from the funds restored to the joint venture and being administered by the court's receiver, seems to me entirely evident.

In *Tevander v. Ruysdael*, 299 *F.* 746 (7 *Cir.* 1924), the Court of Appeals for the Seventh Circuit found little difficulty in reaching a just result in a comparable situation though the federal practice was like ours (*R. R.* 4:55–7) in having ordinary litigants bear their own legal expenses while providing for equitable exceptions including so-called "fund" cases. See 6 *Moore, Federal Practice* § 54.77(2) (*2d ed.* 1965); *Sprague v. Ticonic National Bank*, 307 *U. S.* 161, 164–167, 59 *S. Ct.* 777, 83 *L. Ed.* 1184, 1186–1187 (1939). The plaintiff and defendant in *Tevander* were in copartnership when the defendant misappropriated assets and transferred them to a corporation. The plaintiff brought a pro-

ceeding to have the transfer declared void and the misappropriated assets delivered to a receiver for distribution. She prevailed and sought to have her legal expenses taxed against the defendant. In holding that she was entitled to relief, the court concluded that the restored fund should bear the expenses, pointing out that it would be a "harsh and inequitable rule" that would compel the plaintiff to bear all of her legal costs in the circumstances presented. 299 F., at p. 749.

The plaintiff Grober does not seek to impose an additional charge against the wrongdoing fiduciary or trustee individually as was sought in *Liberty Title & Trust Co. v. Plews,* 6 N. J. 28 (1950). He seeks to and does bring himself within the literal term of R. R. 4:55–7 which vests discretionary authority in the trial court to make an allowance out of a "fund in court." This term is, of course, not self-defining and its content will turn on what the court puts into it. Thus in *State v. Otis Elevator Co.,* 12 N. J. 1 (1953), it was held that an escheat proceeding by the State against the defendant corporation to compel it to turn over abandoned property to the State involved a fund in court though that would hardly be so in any strict sense. See 12 N. J., at pp. 26–31.

In *Katz v. Farber,* 4 N. J. 333 (1950), a fund in court was found to be present where the purchaser obtained specific performance and deposited the purchase price with the clerk for distribution to the sellers who were in a dispute as to their respective interests. In the course of his opinion for the Court, Justice Case illustrated the broad scope of the term without, however, suggesting that his illustrations, though clearly enough to cover the plaintiff Grober's case, were intended to be exhaustive or that there was to be no equitable flexibility or individualization (*Sprague v. Ticonic National Bank, supra,* 307 U. S., at p. 167, 59 S. Ct., at p. 780, 83 L. Ed., at p. 1187) in the application of the rule:

"The words 'fund in court' in *Nobile v. Bartletta, supra* [112 N. J. Eq. 304], and *Universal Indemnity Insurance Co. v. Caltagirone, supra* [119 N. J. Eq. 491], were clearly intended to include such cases as came within the classification 'administration of trusts' mentioned

in the *Stetser case* [Stetser v. American Stores Co., 125 N. J. L. 275]. There is a fund in court 'where the court has jurisdiction over the fund or estate,' *In re Fisher, supra* [In re Fisher's Estate, 115 N. J. Eq. 329], or 'where trust funds in the control of the court are being administered,' *Clements v. Clements, supra* [129 N. J. Eq. 350]. Thus an accounting by the executor, or an administrator or a trustee figuratively brings his fund into court. There may be such a fund when the money is actually in the custody of the court and is the subject of the litigation; also, by analogy, when a litigant by court intercession creates, produces or protects, as in the *Cintas case, supra* [Antas v. American Car & Foundry Co., 133 N. J. Eq. 301], a fund for the benefit of a class of which he is one so that in good conscience the cost of the proceeding should be visited in proper proportion upon the moneys which are thus produced or preserved for the members of the entire class although all did not participate in the litigation." 4 *N. J.*, at *p.* 344.

Here the Appellate Division, relying in part on *Sarner v. Sarner*, 38 *N. J.* 463 (1962), found that there was a fund in court and remanded the matter for the trial court's exercise of its discretionary power under *R. R.* 4:55–7. *Grober v. Kahn*, 88 *N. J. Super.* 343, 352–358 (1965). In rejecting this course, the majority seems to take the position that, the compelling equitable considerations notwithstanding, the plaintiff Grober cannot bring himself within the fund in court rule since his action was actually brought for his own benefit and not as a member of a larger class. Viewed realistically, the plaintiffs in *Sarner* also brought their action for their own benefit and not as members of a larger class; and while it is true that in form their action was for the benefit of the corporate entity, if form is to be dispositive but equity is not to be ignored, we may readily view the joint venture here as the entity and the proceeding as having been brought for its benefit. See *X–L Liquors v. Taylor*, 17 *N. J.* 444, 454–455 (1955); *Tevander v. Ruysdael, supra*, 299 *F.* 746. However, this need not be pursued, since the absence of a class to be benefited beyond the plaintiff himself is not necessarily a bar. See *United States v. Equitable Trust Co.*, 283 *U. S.* 738, 51 *S. Ct.* 639, 75 *L. Ed.* 1379 (1931); *State v. Otis Elevator Co., supra.*

In *Otis,* Chief Justice Vanderbilt pointed out that "one does not need to find a class to support the doctrine of a fund in court." 12 *N. J.,* at *pp.* 10–11. He cited *Katz v. Farber, supra,* and also the *Equitable Trust* case where the Supreme Court permitted the charging of counsel fees to the fund, in a proceeding brought on behalf of an incompetent Indian for recovery of his property which had been dissipated with the approval of the Secretary of the Interior. Justice Van Devanter pointed out that it is a general rule in courts of equity "that a trust fund which has been recovered or preserved through their intervention may be charged with the costs and expenses, including reasonable attorneys' fees, incurred in that behalf." 283 *U. S.,* at *p.* 744, 51 *S. Ct.,* at *p.* 641. 75 *L. Ed.,* at *p.* 1384. In a recent comment on *Sarner, Otis* and *Equitable Trust,* it was noted that "no class need exist at all" and that "substituted for that requirement is a situation which compels an innocent party to institute proceedings to protect the fund itself if his own rights are not to be destroyed." Note, "Allowance of Counsel Fees Out of a 'Fund in Court': The New Jersey Experience," 17 *Rutgers L. Rev.* 634, 641 (1963).

A rigid approach would perhaps have been understandable in the days immediately following constitutional revision when the abuses in Chancery were viewed as a continuing threat. But that was almost two decades ago, Chancery has become but a fading memory, and we are now confronted with more troublesome problems which call for comprehensive restudy of *R. R.* 4:55–7. See *Bergen Builders, Inc. v. Horizon Developers, Inc.,* 44 *N. J.* 435, 438–439 (1965) (concurring opinion). In the meantime, the rule should be administered with a proper measure of equitable flexibility and with full recognition that here, as elsewhere, "justice is the polestar." *New Jersey Highway Authority v. Renner,* 18 *N. J.* 485, 495 (1955) ; see *R. R.* 1:27A; *Handelman v. Handelman,* 17 *N. J.* 1, 10 (1954) ; *Martindell v. Martindell,* 21 *N. J.* 341, 349 (1956).

Justice Schettino joins this dissent.

*For reversal*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR and HALL—4.

*For affirmance*—Justices JACOBS and SCHETTINO—2.