*600 Justice LaVECCHIA,
dissenting.
Paying lip service to the American Rule, the Court today again refines what it terms “our tightly circumscribed exception to New Jersey’s general rale against awarding counsel fees to prevailing parties” and orders the awarding of fees against attorneys who breached escrow responsibilities owed to the client of an adversary. Ante at 587, 136 A.3d at 109.
In Saffer v. Willoughby, 143 N.J. 256, 670 A.2d 527 (1996), this Court held that a successful legal malpractice plaintiff could recover attorneys’ fees, but only against the former lawyer with whom the attorney-client relationship existed. What started as a limited, common law exception to the American Rule has been altered through a series of cases, which now culminates with today’s decision. In its present adjustment to our case law governing fee shifting, the majority deals the American Rule yet another blow by expanding awards of attorneys’ fees to non-clients of attorneys in escrow settings.
In my view, the Court’s fee award is unsupported by existing case law, statutory law, or court rule. I can endorse neither the majority’s rationale nor this further encroachment on the American Rule. Respectfully, I dissent.
I.
In 1948, this Court was presented with “a choice of philosophies” — a choice between the English Rule, which allowed for the liberal award of counsel fees to prevailing litigants, and the American Rule, which did not. See State v. Otis Elevator Co., 12 N.J. 1, 26, 95 A.2d 715 (1953) (Jacobs, J., dissenting).
We picked the latter, and for good reason. The Court of Chancery at the time “had discretionary power to allow counsel fees in such amounts as appeared to it to be reasonable.” Alcoa Edgewater Fed. Credit Union v. Carroll, 44 N.J. 442, 446, 210 A.2d 68 (1965). That predictably led to growing abuses. With no outer cap on fee awards, save a narrow exception, some members *601 of the bar received excessive allowances. Ibid. Faced with the looming prospect of an outsize fee award, “prospective litigants with presumably just causes had been discouraged from instituting actions in equity.” Ibid.; see also Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 167, 162 A.2d 834 (1960) (recognizing that Court of Chancery practice “proved unduly onerous upon litigants and spawned charges of favoritism”).
Through court rule, this Court, accordingly, placed New Jersey firmly in the American Rule camp, “barring counsel fees except ... ‘as provided by these rules or by law with respect to any action, whether or not there is a fund in court.’ ” John S. Westervelt’s Sons v. Regency, Inc., 3 N.J. 472, 475, 70 A.2d 767 (1950) (quoting and upholding then -Rule 3:54-7 as permissible use of Court’s rulemaking authority). When, in 1950, the Legislature attempted to roll back the new limits on fee awards, it was met with Governor Driscoll’s veto pen. The legislation, according to the Governor, “would revive an unhappy practice that has been generally repudiated.” Otis Elevator Co., supra, 12 N.J. at 27, 95 A.2d 715 (Jacobs, J., dissenting) (quoting Veto Messages of Hon. Alfred E. Driscoll, Governor of New Jersey 76 (1950)).
The current Rule 4:42-9 represents New Jersey’s adherence to the American Rule. That rule has served us well. Ensuring that litigants are not discouraged from pursuing redress in our courts because of the fear that, if unsuccessful, they must carry their opponent’s legal fees, the American Rule promotes “[ujnfettered access to the courts for all citizens with genuine legal disputes.” In re Estate of Lash, 169 N.J. 20, 43, 776 A.2d 765 (2001) (Verniero & LaVecchia, JJ., dissenting) (quoting Neal H. Klausner, Note, The Dynamics of Rule 11: Preventing Frivolous Litigation by Demanding Professional Responsibility, 61 N.Y.U. L.Rev. 300, 304 (1986)). Put simply: “[Wjhile the English Rule foeuse[s] on providing full compensation to the winner, the American Rule emphasize[s] equal access to justice.” Ibid, (quoting Mihalik v. Pro Arts, Inc., 851 F.2d 790, 793 (6th Cir.1988)). The American Rule is also administratively efficient, unburdening our *602 trial courts from continually making “the somewhat arbitrary calculation of the ‘reasonable costs’ incurred by a prevailing party.” Ibid, (quoting Klausner, supra, 61 N.Y.U. L.Rev. at 305).
II.
We held closely to our policy choice against ad hoc fee shifting for nearly fifty years. See, e.g., Grober v. Kahn, 47 N.J. 135, 151, 219 A.2d 601 (1966) (“[T]he question whether a fraud or a breach of a fiduciary obligation should warrant imposition of counsel fees is a policy issue which was resolved when our rules of court were formulated. If a change is to be made, it should be made with directness and in relevant terms. Meanwhile the policy of our rule should be honored.”).
Then came Saffer, supra, in which this Court carved out an exception to the American Rule, allowing successful legal malpractice plaintiffs to recover counsel fees. 143 N.J. at 271-72, 670 A.2d 527. Recognizing that the goal of a legal malpractice claim is to place the client in the same position in which he or she would have been had the attorney rendered capable service, the Court held that “a negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting the legal malpractice action.” Id. at 272, 670 A.2d 527 (emphasis added). The fee award was appropriate, the Court reasoned, as part of the “consequential damages that are proximately related to the malpractice.” Ibid.
In Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427, 771 A.2d 1194 (2001), this Court broadened Saffer to reach claims against attorneys for intentional misconduct. In that case, an attorney owed a corporation dual fiduciary duties, both as a director and as legal counsel. Id. at 436-37, 771 A.2d 1194. The trial court found that he committed intentional misconduct in his role as counsel and, applying Saffer, ordered a fee award. Id. at 438-39, 771 A.2d 1194. The Appellate Division reversed, finding Saffer inapplicable. Id. at 440, 771 A.2d 1194. To the panel, *603 because the plaintiffs had not succeeded on a malpractice claim, Sajfer could not support a fee award. Ibid,.
This Court reversed the Appellate Division. Sajfer’s extension — from attorney negligence to intentional misconduct — was based on a simple principle: “[A]n attorney who intentionally violates the duty of loyalty owed to a client commits a more egregious offense than one who negligently breaches the duty of care.” Id. at 443, 771 A.2d 1194. It would, this Court said, be an “incongruous result” if a plaintiff could recover counsel fees for attorney malpractice but not for “an intentional violation of a fiduciary duty arising as a result of the attorney-client relationship.” Id. at 442, 771 A.2d 1194. The Court made it a point to highlight that, even in cases of intentional misconduct, establishing “the existence of an attorney-client relationship [is] a prerequisite to recovery.” Id. at 443, 771 A.2d 1194 (emphasis added). That requirement harmonized the Court’s holding with Sajfer’s twin goals of “holding attorneys responsible for professional conduct that causes injury to their clients” and allowing clients to recover “for losses proximately caused by the attorney’s improper performance of legal services.” Ibid.
The Court closed by emphasizing that breach of a fiduciary duty, alone, did not support the fee award. Although the defendant in Packard-Bamberger owed dual, overlapping fiduciary duties, it was only because he violated his duty to the plaintiff as legal counsel that the fee award was justified. Id. at 443, 771 A.2d 1194. Had he not assumed that role, and had he not rendered any legal services, “attorneys’ fees would not have been appropriate unless authorized by contract, statute, or some other specific rule.” Ibid.
Both Sajfer and Packard-Bamberger relied on the attorney-client relationship as a condition to a fee recovery in attorney-misconduct cases. Nothing in either of those cases supports the idea that a fiduciary relationship, outside of the attorney-client relationship, can support a fee award. See Lash, supra, 169 N.J. at 34, 776 A.2d 765 (“Packard-Bamberger makes clear that the *604 fact that a person owes another a fiduciary duty, in and of itself, does not justify an award of fees unless the wrongful conduct arose out of an attorney-client relationship.”). Because there is no attorney-client relationship here, it is plain that neither Saffer nor Packardr-Bamberger support the majority’s holding.
Neither does this Court’s series of fee-shifting cases involving a fiduciary. The first case the majority relies on is In re Estate of Lash, which deserves to be placed in its factual context.
Lash was a surety ease; the administrator of an estate misappropriated estate funds. Id. at 24, 776 A.2d 765. Fireman’s Fund Insurance Company provided the surety bond, protecting the estate against fraudulent actions by the estate’s administrator. Ibid. After the administrator’s malfeasance, the estate alleged that Fireman’s Fund, as surety, was liable not only for the estate’s loss but also for counsel fees incurred in proceeding on the bond. Id. at 25, 776 A.2d 765.
Relying on surety and tort principles, this Court held that the counsel fees could be charged to the surety. First, the Court determined that the administrator could be liable for the estate’s counsel fees in proceeding on the surety bond. Citing to the Restatement (Second) of Torts § 914(2), the Court explained that if a plaintiff has been forced into litigation against a third party because of a tortfeasor’s wrongful conduct, the plaintiff can recover those counsel fees from that litigation from the tortfeasor. Id. at 26, 776 A.2d 765. The Court concluded that “[tjhose fees are merely a portion of the damages the plaintiff suffered at the hands of the tortfeasor.” Ibid. Because the administrator’s wrongdoing caused the estate to file an action against the surety, the court reasoned that the administrator is responsible for the estate’s counsel fees. Id. at 27-28, 776 A.2d 765.
The Court then considered whether Fireman’s Fund, as surety, could be liable for those fees. Answering that question in the affirmative, the Court explained that upon breach of an administration bond, “[t]he surety is required to bear any injurious consequences arising from loss to the estate.” Id. at 28, 776 A.2d *605 765 (quoting 31 AmJur.2d Executors and Administrators § 350 (1989)). The Court held that because the surety was liable to the full extent of the administrator’s damage, its obligation included the fees incurred in proceeding on the bond. Id. at 28-29, 776 A.2d 765.
Last, the Court considered whether its fee award violated the American Rule. It did not, the Court explained, stating that “[t]hose fees do not implicate the American Rule because they were incurred in the litigation on the bond, rather than the litigation against [the administrator].” Id. at 32, 776 A.2d 765. The Court emphatically declared that its decision was not “an application of Saffer and Packard-Bamberger.” Id. at 33, 776 A.2d 765. Those cases authorized a fee award directly against a defendant-attorney — a result that, although contrary to the American Rule, “was authorized ... due to the significance of the attorney-client relationship.” Ibid. Instead, the Court’s fee award in Lash was declared “distinct from Saffer because the fees are damages incurred in litigation other than to establish [the administrator’s] liability.” Id. at 34, 776 A.2d 765.
Next, the Court decided In re Niles Trust, 176 N.J. 282, 823 A.2d 1 (2003). In that matter, through undue influence, a mother and son, Serena and Salvatore Bono, acting in concert, convinced a wealthy, elderly heiress to name Salvatore executor of her will and trustee of her revocable trusts. Id. at 288-89, 823 A.2d 1. ‘With his newfound power, [Salvatore] embarked on a sixteen-month looting spree of [the] estate.” Id. at 289, 823 A.2d 1. Our Court faced the question of whether the estate should be reimbursed for the counsel fees it incurred in the litigation against Salvatore and Serena. Id. at 296, 823 A.2d 1. A three-justice majority, over a dissent, created another exception to the American Rule. Id. at 297, 823 A.2d 1. This time, the Court’s majority had to confront directly the strictures of the American Rule, because, as the majority acknowledged, to charge the fiduciary with counsel fees “is tantamount to charging the losing parties with the prevailing parties’ counsel fees.” Id. at 296, 823 A.2d 1.
*606 But, to the Niles majority, the interests of equity demanded the creation of a new exception to the American Rule. The Court compared the fiduciary relationship there to the attorney-client relationship in Saffer and Packard-Bamberger. “Like an attorney who commits ... undue influence while representing a testator, settlor or an estate, a trustee of an estate who exercises undue influence over a testator intentionally has breached a fiduciary relationship in a manner at least as egregious as the administrator’s intentional wrongdoing in Lash, or an attorney who has intentionally breached his fiduciary duty.” Id at 298, 823 A.2d 1. The Court therefore held that “when an executor or trustee commits the pernicious tort of undue influence, an exception to the American Rule is created that permits the estate to be made whole by an assessment of all reasonable counsel fees against the fiduciary that were incurred by the estate.” Id. at 298-99, 823 A.2d 1.
However, the Niles majority assured that its holding would not “open the ‘floodgates.’” Id. at 299, 823 A.2d 1. The majority specifically limited the new exception “to cases in which an executor’s or a trustee’s undue influence results in the development or modification of estate documents that create or expand the fiduciary’s beneficial interest in the estate.” Ibid. Emphasizing that “undue influence represents such an egregious intentional tort that it establishes a basis for punitive damages in a common law cause of action,” the Court promised that “[t]he exception we have created directly follows from the special status of the undue influence tort.” Id. at 300, 823 A.2d 1 (emphasis added).
Our Court’s unanimous decision in In re Estate of Vayda, 184 N.J. 115, 875 A.2d 925 (2005), at least until today, stopped the Court-sanctioned rupture of the American Rule. That case centered on a will dispute between two siblings. The decedent’s most recent will named one sibling, Peter, executor of the estate, contrary to all prior versions. Id. at 118, 875 A.2d 925. But after the will was admitted to probate, Peter did little to administer the estate. Ibid. The other sibling, Katherine, sued, alleging that the *607 will was the product of undue influence and that Peter breached his fiduciary duty as executor. Id. at 119, 875 A.2d 925. The trial court removed Peter as executor, holding that Peter had abandoned his responsibilities as executor. Ibid. However, the will was not determined to be the product of undue influence. Ibid. Yet the trial court considered the circumstances to warrant the imposition of counsel fees, even without an undue influence finding. Ibid.
This Court declined to extend Niles to reach a non-attorney executor who was removed because of a breach of a fiduciary duty — but notably not because of a finding of undue influence. Id. at 123, 875 A.2d 925. The court rules provided a specific remedy: in certain probate actions, Rule 4:42 — 9(a)(3) allows an award of attorneys’ fees “to be paid out of the estate” and not another source. Id. at 124, 875 A.2d 925. That Katherine would not be made entirely whole — part of the cost of maintaining the action against Peter would be paid from her portion of the estate — was “insufficient impetus to warrant a further exception to the American Rule, one to which we have repeatedly averted as ‘a well-established feature of our jurisprudence.’ ” Ibid, (quoting Lash, supra, 169 N.J. at 42, 776 A.2d 765). In a footnote, the Vayda unanimous opinion commented on the scope of Niles: “Had Katherine established that the decedent’s will was the result of undue influence, Peter’s performance as executor would have been squarely governed by the holding of In re Niles, supra.” Id. at 123 n. 4, 875 A.2d 925. Thus, the Vayda Court took the Niles Court at its word and pointedly declined to extend its reach beyond the context of undue influence by an executor or trustee fiduciary.
III.
From Packardr-Bamberger, Lash, and Niles, the majority in this matter draws the ultimate conclusion that an attorney, acting in a fiduciary capacity to a non-client with regard to an escrowed item, who engages in any intentional misconduct is liable for *608 attorneys’ fees.[7] However, those cases do not support that proposition at all. If this Court wishes to use its authority to modify the court rules, through judicial decision, and create a new exception to the American Rule — though in my view unwise — it certainly can. See State v. Clark, 162 N.J. 201, 205, 744 A.2d 109 (2000) (“[T]he Court’s authority to engage in rule making includes the exclusive power to establish or modify Court Rules through judicial decisions.”). However, the majority should abandon any pretense that today’s result flows naturally from our prior cases, when it clearly does not. Because Packard-Bamberger made it a point specifically to explain that a fiduciary duty, apart from an attorney-client relationship, could not justify a fee award, it provides no support for the majority’s decision. Because Lash did not, according to its majority opinion, directly confront the American Rule, it provides no support for the majority’s decision. And because Niles was limited to intentional fiduciary misconduct surrounding the “pernicious” tort of undue influence, it also provides no support for the majority’s decision. Vayda unanimously upheld those distinctions, and they were ratified in dicta by In re Estate of Stockdale, 196 N.J. 275, 306-07, 953 A.2d 454 (2008).
With today’s decision, credibility dissipates from the Niles Court’s breezy assurance that its new exception to the American Rule would not open the floodgates because its holding would be strictly limited to the tort of undue influence. It was not a serious limitation then. See Niles, supra, 176 N.J. at 304, 823 A.2d 1 (LaVecchia, J., dissenting) (“Once the Court decides that it can pick and choose from among individual cases when to deviate from the traditional requirement that there must be a statute, rule, or contract allowing an award of counsel fees, there is no discernible difference between fees in a case of fraud by a trustee and fees in the case of any other intentional tort.”). The majority’s holding, in effect if not in its words, undercuts reliance on that facade today.
*609 In terms of our jurisprudence, it is unclear what to make of the breadth of the majority’s decision. Although the majority’s holding describes the fee-shifting expansion in terms of the case’s factual context — attorneys acting as a fiduciary in an escrow setting — the analysis blurs two distinct analytic lines of case law. Either the majority is expanding the Saffer and Paekard-Bamberger precedent by allowing fee-shifting against attorney defendants to extend now to non-client relationships,[8] or the majority is no longer limiting fiduciary fee-shifting to the singular context of undue influence claims. The former is narrower in its likely future impact because it affects only lawyers, as a class of defendants, and therefore does less damage to the American Rule. But it does treat attorneys worse than all others who may act in an escrow capacity, and other non-lawyer people and entities do perform escrow responsibilities. Further case law will tell whether the line of distinction will remain fixed at lawyers acting as escrows. However, the majority’s emphasis on intentional conduct in its fee-shift rationale in this matter could portend future fee-shift requests from others injured by anyone who was charged with acting in a fiduciary capacity. And that risks a much broader *610 exception to the American Rule, one that would expose a host of actors to new, expanded liability.
Arising in a vast array of factual settings, fiduciary relationships are many: doctors to their patients; agents to their principals; partners to their other partners; corporate officers to their shareholders; brokers, including insurance, real estate, and securities brokers, to their clients; and public officials to their constituents.[9] That list is just a sampling, as “[a] fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship.” F.G. v. MacDonell, 150 N.J. 550, 563, 696 A.2d 697 (1997) (citing Restatement (Second) of Torts § 874 cmt. a (1979)). If read broadly, the majority’s holding could be interpreted as opening all fiduciary actors to liability for fee awards so long as they engage in intentional misconduct. If so, it would take significant effort by the Legislature to unravel the potential fee-shifting cracked open for argument by the majority.
*611 To be clear, as escrow agents, there is no doubt that defendants here owed a fiduciary duty to Innes — the client of their adversary. See In re Hollendonner, 102 N.J. 21, 26, 504 A.2d 1174 (1985) (“It is well settled that an escrow holder acts as an agent for both parties.”). They breached that duty when they turned over the child’s passport without Innes’s permission in this ongoing contentious divorce and custody proceeding. Although they are attorneys, defendants were not Innes’s attorneys, taking this appeal out of the attorney-client realm of Saffer and Packard-Bamberger. And they surely did not commit the undue influence tort, making Niles equally inapplicable. Without an attorney-client relationship, and without an undue influence finding, a fee award cannot be justified under present law. That leaves only a painful but nonetheless straightforward breach of a fiduciary responsibility, which our law, until today, held insufficient to shift fees. See Packard-Bamberger, supra, 167 N.J. at 443, 771 A.2d 1194 (“[I]f [defendant] had not been counsel to [the corporation], his fiduciary duty to [that corporation] would have arisen solely from his status as a director. He would not have rendered any legal services to the corporation and, therefore, attorneys’ fees would not have been appropriate unless authorized by contract, statute, or some other specific rule.”).
The majority has therefore extended our law beyond Saffer, beyond Packard-Bamberger, beyond Lash, and beyond Niles — an extension, and further erosion of the American Rule, that I resist.
It is true that absent an award of attorneys’ fees, the prevailing party in this breach-of-a-fiduciary-responsibility litigation is not fully compensated for the loss suffered. But that is true in practically every context in which damages must be recovered through legal action. In any standard contract or tort claim, the cost of maintaining the action prevents a prevailing plaintiff from realizing the full measure of damages. Since its inception, the American Rule has rejected the idea that counsel fees are necessary to fully compensate the prevailing party in litigation. See Thomas D. Rowe, Jr., The Legal Theory of Attorney Fee Shifting, *612 1982 Duke L.J. 651, 657 (1982) (“[T]he American [R]ule’s effect of reducing a successful plaintiffs recovery by the amount of his lawyer’s fee conflicts with the make-whole idea underlying much of the law of remedies.”). The majority’s policy choice in this matter tosses aside that basic premise.
Finally, the way in which the majority reaches its result deserves mention. The majority’s holding, permitting the possibility of fee-shifting in this attorney-breach-of-an-escrow-fiduciary-duty matter, is grounded on intentional misconduct by an attorney in respect of fulfilling escrow duties. In doing so, it may be surmised that the majority recognizes that even under its interpretation of the law, fees would not be available based on negligent conduct. However, this case was presented by experienced counsel and was submitted to the jury based on negligent conduct. The majority now makes this case a different one than that which was tried by the parties and counsel. There may have been considered consequences, including insurance availability, which strategically led to the decision to try the case in the manner that the parties and all counsel presented it. In my view, this Court should refrain from refashioning the trial choices of the parties and professionals who handled this matter.
IV.
To be sure, there is good cause to be dismayed at the fiduciary breach here. It had tragic consequences — separating a young child from her father. But a desire to do equity in a sympathetic case cannot substitute for adherence to our Court’s policy choice that the administration of justice is best served when parties to litigation bear their own counsel fees, a policy that dates back almost as far as the institution of our modern Court itself. That policy holds that absent statute, court rule, or contract authorizing fee-shifting, counsel fees are not recoverable as damages. Because the “policy of our rule should be honored,” Grober, supra, 47 N.J. at 151, 219 A.2d 601, I respectfully dissent.
*613 For affirmance as modification and remandment — Chief Justice RABNER, and Justices ALBIN and SOLOMON — 3.
For dissent — Justice LaVECCHIA and Judge CUFF (temporarily assigned) — 2.
Not Participating — Justices PATTERSON and FERNANDEZ-VINA — 2.

 Despite the majority's declaration, there is no finding of intentional misconduct in this record. The jury verdict was based on negligence.

 Implicit in the majority’s determination is an unresolved question: what is the theoretical underpinning to Saffer and Packard-Bamberger that led to fee-shifting for clients in attorney-misconduct litigation against their former lawyer? Did the Court initially go down that path on the rationale that fees spent to prosecute legal malpractice actions are consequential damages? Or, was Saffer and Packard-Bamberger fee-shifting based on the special considerations inherent in the lawyer-client relationship, over which the Court has supervisory control. The more solid rationale is the lawyer-client basis. Both decisions were firmly rooted in the attorney-client relationship. Saffer mentions the consequential damages angle, but it is not its takeaway principle. In my view, one should not read out of the Saffer and Packard-Bamberger opinions all of their limiting language about the attorney-client premise to their holdings. And subsequent decisions have since emphasized the limiting principle to those holdings. If Saffer and Packard-Bamberger are read otherwise, the consequential damages theory — untethered to the attorney-client justification for fee-shifting in such relationships — broadly undercuts the American Rule and can be stretched to an extensive range of claims. See infra at 611-12, 136 A.3d at 124.

 See Howard v. Univ. of Med. & Dentistry of N.J., 172 N.J. 537, 547, 800 A.2d 73 (2002) (noting fiduciary relationship between doctor to patient); Hirsch v. Schwartz, 87 N.J.Super. 382, 389, 209 A.2d 635 (App.Div.1965) ("Where a principal-agent relationship exists, ... it follows that the agent as a fiduciary was required to exercise good faith in his relationship with his principal[.]”); Neustadter v. United Exposition Serv. Co., 14 N.J.Super. 484, 493, 82 A.2d 476 (Ch.Div.1951) ("Each partner stands in a fiduciary relationship to every other partner."); Eliasberg v. Standard Oil Co., 23 N.J.Super. 431, 441, 92 A.2d 862 (Ch.Div.1952) ("The directors of a corporation are, of course, fiduciaries, and in their dealings with the corporation and the stockholders the utmost fidelity is demanded."), aff'd, 12 N.J. 467, 97 A.2d 437 (1953); Aden v. Fortsh, 169 N.J. 64, 78, 776 A.2d 792 (2001) ("Insurance intermediaries in this State must act in a fiduciary capacity to the client...."); Silverman v. Bresnahan, 35 N.J.Super. 390, 396, 114 A.2d 307 (App.Div.1955) (noting settled nature of fiduciary relationship between real estate broker and property owner); McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 767 (3d Cir.1990) (signaling similar fiduciary obligation for stockbrokers); Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 474, 86 A.2d 201 ("The members of the board of chosen freeholders and of the bridge commission are public officers holding positions of public trust. They stand in a fiduciary relationship to the people whom they have been elected or appointed to serve.”), cert. denied, 344 U.S. 838, 73 S.Ct. 25, 97 L.Ed. 652 (1952).