MAURICE W. GROBER and MABEL GROBER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Grober v. Commissioner
Docket Nos. 980-67, 3861-67, 3860-67, 3886-67.
United States Tax Court
T.C. Memo 1972-240; 1972 Tax Ct. Memo LEXIS 17; 31 T.C.M. (CCH) 1179; T.C.M. (RIA) 72240; December 4, 1972, Filed Arthur Pelikow, Scott A. Dahlquist, Jacob C. Abramson, and Samuel S. Saiber, for the petitioners. Gerald Backer, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The trial of these consolidated cases was held in Newark, New Jersey, before Commissioner James M. Gussis of this Court. His report, containing findings of fact, was submitted to the Chief Judge. The parties filed exceptions to some of the findings of fact. We have adopted the findings of fact made by the trial commissioner and they are set forth below. Respondent determined deficiencies in the petitioners' income tax and additions to tax for the years 1956, 1957, and 1958 as follows: Addition to tax
Income Tax
section 6653 (b)
Docket No.
Year
Deficiency
I.R.C. 1954
Maurice W. Grober and Mable Grober
980-67
1956
$ 91,228.04
$ 61,325.22
1957
23,008.60
11,504.30
1958
4,194.38
2,470.47
Herman Kahn and Gertrude Kahn
3860-67
1956
324,904.28
195,176.32
1957
97,926.00
48,963.00
1958
22,791.98
14,042.28
Monroe J. Weintraub and Carol Weintraub
3861-67
1956
40,349.00
1957
8,255.60
1958
1,344.69
Joseph E. Brooks and Alice K. Brooks
3886-67
1956
41,004.39
1957
6,237.58
1958
3,681.97
*19 In his amended answer in docket No. 3860-67, the respondent claimed the following increases in the petitioners' (Herman and Gertrude Kahn) income tax deficiencies and additions to tax: Addition to tax
Income Tax
section 6653 (b) Year
Deficiency
I.R.C. 1954
1956
$136,543.26
$68,271.63
1957
31,366.79
15,683.40
1958
5,214.31
2,607.15
The issues in these consolidated cases are (1) whether H. Kahn & Associates was a partnership during the years 1956, 1957 and 1958 within the meaning of section 761 of the Internal Revenue Code of 1954; [2] (2) whether the gain realized by H. Kahn & Associates during the years here involved from the sales of certain used machinery and other equipment is taxable as capital gains or as ordinary income; (3) whether the gains from sales of scrap materials during the years here involved to L. Blumberg & Sons, Inc. were realized by H. Kahn & Associates or by Condenser Service and Engineering Co.; (4) whether the income from a servicing contract (originally entered into by the United States Navy with the Camden Forge Company) was realized by H. Kahn & Associates or by Condenser Service and Engineering *20 Co.; (5) whether any part of the underpayment of tax for the years 1956, 1957 and 1958 in Docket No. 3860-67 (Kahn) was due to fraud within the meaning of section 6653(b); (6) whether entertainment expenses incurred by petitioner Maurice W. Grober (Docket No. 980-67) in 1956, 1957 and 1958 in the respective amounts of $800, $1,500 and $1,500 are deductible as ordinary and necessary business expenses under section 162; (7) whether petitioner Maurice W. Grober (Docket No. 980-67) received additional income in 1956 in the amount of $586.22 as reimbursement to him of personal expenditures by his corporate employer; and (8) whether several miscellaneous adjustments made by respondent in Docket Nos. 3860-67 (Kahn), 3861-67 (Weintraub) and 3886-67 (Brooks) involving disallowed deductions and additions to income were 1 correct. Respondent has conceded that no part of the underpayment of tax in 1956, 1957 and 1958 in Docket No. 980-67 (Grober) was due to fraud within the meaning of section 6653(b). Respondent has also conceded in Docket No. 980-67 that the amount of $15,000, purporting *21 to be a payment from the Iron Fireman Corp., is not includable in petitioners' income for the year 1956. FINDINGS OF FACT Some of the facts were stipulated in Docket Nos. 3860- 67 (Kahn), 3861-67 (Weintraub) and 3886-67 (Brooks) and they are so found. Herman and Gertrude Kahn, husband and wife, were residents of New York, New York at the time their petition herein was filed. Their joint Federal income tax returns for the years 1956, 1957 and 1958 were filed with the district director of internal revenue, New York, New York. Maurice W. Grober and Mabel Grober, husband and wife, were residents of Orange, New Jersey at the time their petition herein was filed. Their joint Federal income tax returns for the years 1956, 1957 and 1958 were filed with the district director of internal revenue, Newark, New Jersey. Monroe J. Weintraub and Carol Weintraub were husband and wife during the years here involved and were residents of Woodmere, L.I., New York at the time their petition herein was filed. Their joint Federal income tax returns for the years 1956, 1957 and 1958 were filed with the district director of internal revenue, Brooklyn, New York. Joseph E. Brooks and Alice K. Brooks were *22 husband and wife during the years here involved and were residents of Fort Lauderdale, Florida at the time their petition herein was filed. Their joint Federal income tax returns for the years 1956, 1957 and 1958 were filed with the district director of internal revenue, Brooklyn, New York. Condenser Service and Engineering Co. (hereinafter called Condenser) was at all times here relevant a New Jersey corporation with its principal place of business in Hoboken, New Jersey. Condenser was engaged in the manufacture, sale and installation of condensers, heat exchangers and related equipment. Maurice Grober was employed by Condenser in 1943 as plant manager and ultimately became the company's vice president in charge of all operations. In 1953 the controlling stock interest in Condenser was acquired by Consolidated Products Co., Inc. (hereinafter called Consolidated), a New York corporation which was wholly-owned by Herman Kahn and which was engaged in the business of buying and selling used machinery, including the acquisition of entire plants for liquidation. During the period here relevant, Consolidated owned all of the outstanding stock of Condenser. A condition of the purchase *23 of the stock in Condenser by Consolidated in 1953 was that Grober would remain in the employ of Condenser for at least two months. However, Kahn persuaded Grober to remain with Condenser for a longer period of time in charge of all the operations of Condenser. In 1955 Grober was contacted by Hyman D. Lerich who was counsel and a director of the Camden Forge Company, Inc. (hereinafter called Old Camden Forge), a corporation with offices and a plant in Camden, New Jersey and engaged in the manufacture of steel forgings. Old Camden Forge was experiencing managerial difficulties and Lerich offered the presidency of Old Camden Forge to Grober at an annual salary of $40,000. Grober was persuaded by Kahn to reject the offer. Grober was subsequently advised that as a result of continued difficulties Old Camden Forge decided to sell its properties and to arrange for the completion of certain work in process. Since Grober was financially unable to undertake such a transaction, he brought it to the attention of Kahn who then entered into negotiations for the acquisition. On December 30, 1940, Old Camden Forge and the United States Navy had entered into an agreement (Nobs 2622, formerly designated *24 NOD 1658) pursuant to which the United States Navy erected a building on the Old Camden Forge premises and equipped it with machinery and equipment for the production of naval and airplane parts and other items for the Navy. Old Camden Forge was required to maintain such facilities. The agreement contained a standby clause wherein Old Camden Forge was to preserve the buildings and facilities for a period of five years after the cancellation of the agreement so as to insure their full availability during such period. This clause was referred to as the "dormant estate" clause. The agreement gave Old Camden Forge the right to acquire the Navy's facilities when no longer required by the Navy. This agreement was subsequently amended on October 8, 1945, to provide a formula for compensation to be paid by the United States Government to Old Camden Forge in connection with the removal, cleaning and shipment of Navy equipment (hereinafter referred to as the servicing contract). In its negotiations with Kahn, Old Camden Forge informed him that its real and personal properties could not be sold without some satisfactory arrangement for the completion of the work in process. Old Camden Forge *25 was also interested in a purchaser with sufficient financial status so that a novation agreement could eventually be entered into with the United States Navy to relieve Old Camden Forge of any potential liability with respect to the Navy servicing contract. It was agreed that Condenser would complete the Old Camden Forge work in process under Grober's direction. On or about October 6, 1955, Old Camden Forge entered into an agreement with Kahn for the sale of certain real estate described therein and for the sale of machinery, equipment and other goods and chattels. The total purchase price for the said property was $500,000. Certain assets of the United States Navy (a building and the machinery and equipment contained therein) were excepted from the sales agreement. However, all of Old Camden Forge's rights to the Navy property and Old Camden Forge's obligations under the servicing contract were assigned to and assumed by Kahn. Under the October 6, 1955 agreement, the Camden Forge Company also transferred to Kahn all of its right, title and interest in the use of the name "Camden Forge Company." Title to the Old Camden Forge real estate was deeded to Kahn under date of October 6, 1955. Title *26 to the machinery and equipment was also transferred to Kahn by bill of sale dated October 6, 1955 and Old Camden Forge received the full purchase price of $500,000. Kahn purchased the plant and equipment of Old Camden Forge with the intention of liquidating such assets as soon as Condenser had completed the Old Camden Forge work in process. The assessed valuation of the land and buildings acquired by Kahn from Old Camden Forge in October 1955 was $345,000 and the assessed valuation of the machinery and equipment so acquired was $397,000, or a total assessed valuation of $742,000. After Kahn had acquired the real estate, machinery and equipment of Old Camden Forge, an agreement with respect thereto was executed by Kahn, his wife, his daughers Alice Brooks and Carol Weintraub, and Grober. Grober was dissatisfied with some of the terms of the agreement (particularly with respect to his continued employment by Condenser for an unlimited period) but agreed to execute the agreement with the understanding that a more satisfactory agreement would be prepared upon Kahn's return from a Florida vacation. Subsequent to Kahn's return, a new agreement was prepared under date of October 6, 1955 and *27 executed only by Kahn and Grober. The agreement provided in part as follows: AGREEMENT date the 6th day of October 1955, between HERMAN KAHN of 209 Rugby Road, Brooklyn, New York (hereinafter called "Kahn"); and MRS. GERTRUDE KAHN of 209 Rugby Road, Brooklyn, New York, MRS. ALICE BROOKS of Hempsted, L.I., N.Y., MRS. CAROL WEINTRAUB of Hempsted, L.I., N.Y., and MAURICE W. GROBER of 366 Highland Avenue, Orange, New Jersey (hereinafter called "Grober"), (hereinafter collectively called "Participants"): WHEREAS, by contract dated October 6, 1955 Kahn agreed to purchase from Camden Forge Company certain real estate and machinery, equipment and other personal property, more particularly described therein and located in Camden, New Jersey; and WHEREAS, by Deed dated October 6, 1955 and recorded October 10, 1955 in the Register's Office of Camden County, New Jersey, in Book 1960 of Deeds for said County at Pages 422, & c, and by Bill of Sale dated the 6th day of October, 1955, the said real estate and machinery, equipment and other personal property was conveyed by Camden Forge Company to Kahn for the sum of $500,000.00, $495,000.00 of which was borrowed by Kahn from Consolidated Products *28 Company and used for the purchase of the said properties, to be discharged and repaid upon the re-sale by Kahn of all of the properties so purchased, at an interest rate of 5% per annum; NOW, THEREFORE, in consideration of the payment to Kahn of $1,250.00 from Grober, $1,250.00 from Mrs. Gertrude Kahn, $675.00 from Mrs. Alice Brooks and $675.00 from Mrs. Carol Weintraub, receipt whereof is hereby acknowledged by Kahn and in further consideration of the performance by the parties hereto of the agreements herein contained, the signatories agree, as follows: 1. Kahn hereby assigns and transfers to Gertrude Kahn and Maurice W. Grober 25% each, and to Mrs. Carol Weintraub and Mrs. Alice Brooks 12-1/2% each of his right, title and interest in and to the real estate, equipment, machinery and other personal property purchased by him in Camden, New Jersey, as more particularly described above. Kahn reserves unto himself, however, the right, power and authority to sell or lease in his name, by Deed, and/or Bill of Sale, or lease, as the case may be, any or all the properties, subject matter of this agreement; provided, however, that such sale or lease shall be bona fide and that the purchase *29 price or rental terms, as the case may be, shall be the best offered to Kahn at the time of any proposed sale or lease. It is understood and agreed between the parties that the terms of this agreement shall not constitute, or be in any wise considered, a lien upon the properties or premises. The Participants covenant that this instrument shall not be recorded for any purpose whatsoever, it being further understood that should any Participant record this agreement in any office of the County of Camden, then as to such Participant this agreement shall become null and void and of no effect. 2. Upon the sale and liquidation to cash of the real estate, machinery, equipment and other personal property purchased by Kahn as aforesaid, Kahn shall distribute to the Participants, in the percentages of their interest, the net profits realized by such sale and liquidation. 3. Net profits is to be determined by deducting from the gross receipts of such sale and liquidation all costs, charges, liabilities, indebtednesses and advancements incurred by Kahn in the purchase, maintenance, sale and liquidation of said properties, such as, but not limited to monies advanced by Consolidated Products *30 Company as aforesaid, interest charges, costs, fees, comissions, disbursements and other charges to be attendant to the sale and liquidation of said properties by auction, private sale or otherwise, maintenance costs, repairs, capital improvements and other carrying charges on the properties, etc. 4. Distribution of such net profits is to be made immediately after liquidation to cash of the real estate and substantially all of the machinery, equipment and other personal property. 5. Should Grober terminate his employment with Condenser Service & Engineering Co., Inc. of his own accord, within 6 months from the date hereof and prior to the sale of the real estate and substantially all of the machinery, equipment and other personal property, then, at the option of Kahn this agreement shall become null and void and of no effect, except that Kahn shall forthwith return to Grober the sum of $1,250.00 this date paid to him as aforesaid. On the other hand, should Mr. Grober terminate his employment after the said 6 months' period, or should Mr. Grober be discharged by Condenser Service & Engineering Co., Inc., then this contract shall continue in full force and virtue. 6. On the real *31 estate purchased by Kahn from Camden Forge Company as aforesaid are certain buildings, machinery and equipment, owned by the United States Government, which may be acquired by Kahn. In this connection, Kahn agrees that if he acquires such buildings, machinery and equipment from the United States Government, these properties, will be added to and become part of the properties, the subject of this agreement, and the terms, conditions and provisions of this agreement shall apply thereto. * * * The arrangement outlined in the above agreement was subsequently referred to as H. Kahn and Associates, (hereinafter called Associates). Kahn maintained complete dominion and control over the operations of Associates. Grober, as an employee of Condenser, was in charge of the completion of the Old Camden Forge work in process. On October 6, 1955, the Board of Directors of Condenser reselved to execute a contract with Old Camden Forge whereby Old Camden Forge would employ Condenser "to complete the work in process and unfilled orders at Camden, New Jersey, and to dispose of the excess raw materials, supplies and scrap." On October 6, 1955, Condenser executed a contract with Old Camden Forge *32 for the purchase of all of the latter company's goods, chattels, inventories of raw materials, work in process, finished forgings, scrap steel and supplies. Condenser paid Old Camden Forge an amount representing 60 percent of the book value of the assets acquired from Old Camden Forge. The payment was computed as follows: Raw Materials
$ 532,717.76
Work in Process and finished forgings
445,853.42
Scrap Steel
18,322.37
Supplies 18,075.75
$1,014,969.30
60 percent
$ 608,981.00
The October 6, 1955 agreement also provided that Old Camden Forge and Condenser were each to receive 50 percent of the profit realized from the sale of the work in process after it was completed by Condenser. Condenser agreed on October 7, 1955, to rent the Old Camden Forge land, buildings and equipment from Associates at a net rental of $5,000 per month in connection with the completion by Condenser of the Old Camden Forge work in process. During the year 1956 Condenser paid rent to Associates in the amount of $44,278.84. On October 13, 1955, Condenser filed a certificate of doing business under the name of Camden Forge Company as a division of Condenser. The certificate was filed *33 in the Office of the Clerk of Hudson County (New Jersey). On December 28, 1955, and prior to the completion of unfilled orders, Condenser paid $100,000 to Old Camden Forge in final settlement of all obligations arising under the Condenser-Old Camden Forge contract of October 6, 1955. Kahn placed his nephew, Gilbert Kahn, who had been employed by Consolidated, in charge of the sale of machinery and equipment at the Old Camden Forge plant. Gilbert Kahn had extensive experience in the sale of used machinery and equipment while in the employ of Consolidated. Bernard Magrill, an auctioneer with extensive experience in the used machinery business, was engaged by Kahn to conduct an auction of the Old Camden Forge properties on April 10 and 11, 1956. About two or three months before the auction sale, an advertising campaign was commenced which included advertisements in the New York Times and in various trade journals and, through the use of customer lists developed over the years by Consolidated and Condenser, some 10,000 circulars and some 5,000 letters advertising the sale were mailed to potential customers such as machinery dealers, scrap dealers and oil refineries. Extensive preparations *34 were made for the sale. The machinery and equipment was dismantled, cleaned, moved and tagged and the individual items of equipment were prepared for display. Since Kahn and his organization had substantial experience in preparing for plant liquidation, including the conduct of advertising campaigns, Bernard Magrill's services were retained only for the actual conduct of the auction. The auction sale was conducted on April 10 and 11, 1956, and Grober participated actively in the proceedings. The items sold consisted only of machinery and equipment in individual lots. No ingots, billets or scrap materials were sold. Some 1,100 individual lots were sold to various purchasers and an aggregate of $447,577.50 was realized from the auction sale. The checks received in payment at the auction sale were made payable to Bernard Magrill. After endorsement by him, the following stamped endorsement was placed on the checks: "For deposit only in Camden Trust Company to the credit of H. Kahn, Spec." The Camden Trust Company account was opened and utilized for a short period as a repository for the checks received at the auction. The checks deposited in that account for the period it was used totaled *35 approximately $360,000. Not all of the machinery and equipment was sold at the auction and Gilbert Kahn remained in Camden with a staff and made private sales throughout the remainder of 1956. Most of the machinery and equipment was sold in the year 1956 either at the auction sale or in the subsequent private sales. Gilbert Kahn received in payment both cash and checks for the private sales and he delivered them personally to Kahn at his (Kahn's) residence or mailed them to Kahn at the Hoboken, New Jersey, office. Private sales of machinery and equipment, including scrap and silt sales, were continued in 1957 and 1958 by Walter T. Quigley, an employee of Condenser, who sent the sales proceeds to Kahn or gave them to Grober for transmission to Kahn. In 1956 sales of scrap from the Old Camden Forge premises were made to L. Blumberg and Sons on two occasions. The first sale was made on May 2, 1956, and it consisted of 4,000 tons of scrap at $51.25 per ton for a total of $205,000. Payment for the first sale was by certified check made payable to Bernard Magrill. This check was deposited in Condenser's bank account and a debit was made to cash. The credit was to an account called "Notes *36 Payable Officers - H. Kahn, M. Grober." The $205,000 check was included in a $220,000 credit to that account with the said $205,000 reflected as a "Note Payable - H. Kahn." Subsequently, there was a debit to that account of $7,500 on November 26, 1956, in favor of Grober and a debit of $15,000 on December 24, 1956, in favor of Kahn, leaving a balance of $197,500. The balance was carried over to a new general ledger sheet at the beginning of 1957, with $185,000 due Kahn and $12,500 due Grober. The amount of $205,000 was not reflected in any income account of Condenser and was not reflected in any manner on the books of Associates. The second sale of scrap for the amount of $125,000 was made on or about June 8, 1956. It was reflected on the books of Condenser as a debit to cash of $125,000 with the credit as follows: $90,000 to Condenser's income account and $35,000 to the Associates account. On the books of Associates, the Condenser account was debited for $35,000 and a "Sales of Machinery" account was credited for the same amount. Condenser's public accountants inquired about the entries involving the amount of $205,000 and in response to such inquiries two documents prepared on *37 the stationery of Bernard Magrill were submitted to the public accountants. The first document, which was dated June 30, 1956, and was purportedly signed by Magrill, was submitted to the public accountants on March 27, 1957, and stated as follows: H. Kahn & Associates 150 Observer Highway Hoboken, N.J.
Auction Sale, April 10, 1956
Sale of All Machinery and Equipment
203,223.70
Sale of scrap and junk, unsalable machines, boring bars, boring heads, dies, die blocks, floor plates, floor above considered scrap. 205,000.00
408,223.70
Refunds, Returns, Allowances and Deductions 11,291.85
396,931.85
Fee received April 25, 1956, from H. Kahn & Associates $3,500.00
The second document, which was dated March 28, 1957, and also showed the purported signature of Magrill, stated as follows: Consolidated Products Co. Inc., Condenser Service & Engineering Co., Inc., Camden Forge Co. Re: Auction Sale April 10, 1956 Gentlemen: This advice, made at the request of your auditors, S. D. Leidesdorf & Co. Inc., C.P.A. relating to the above subject, is to state that the letter previously sent you addressed to H. Kahn & Associates and dated June 30, 1956, represents *38 the full proceeds of the auction held on that date. There were no sales made for the account of any of the above companies and there were no sales made of any raw material stocks. There are no monies due me or from me to the above named companies. On October 19, 1956, the United States Navy, Kahn and Old Camden Forge executed a novation agreement (effective as of October 6, 1955) whereby Kahn individually acquired all rights to the Navy facilities and succeeded to all obligations under the servicing contract. With respect to the services performed by Condenser (at cost) on the Navy servicing contract, the books of Condenser showed a credit to income for 1957 with amount of $73,597.58 and a corresponding debit to a receivable due from Associates. On Associates' books the amount of $73,597.58 was credited as a liability and debited to various expense accounts. Throughout 1957 Kahn billed the Navy for services performed pursuant to the servicing contract in the total amount of $202,655. In June 1958, the amount of $18,000 was paid to the United States Navy from the Associates' bank account for the release of the "dormant estate" clause which was contained in the 1940 agreement *39 between the Navy and Old Camden Forge. In or about 1958 Kahn acquired title to the Navy facilities at Old Camden Forge. Payment for the Navy facilities was made by cancellation of the amounts due from the Navy under the servicing contract. Neither the billings to the United States Navy in 1957 pursuant to the servicing contract nor the subsequent acquisition of the Navy facilities were reflected on the books and records of Associates. On January 8, 1958, the Navy reduced its obligation under the servicing contract by the amount of $1,996. This was done to reflect the payment by one Mallory Sharon directly to Associates for an item of machinery. On Condenser's books, cash was debited and the Associates account was credited for $1,996. On the books of Associates, the Condenser account was debited and a credit was entered on the Navy account. Associates received payments in connection with insurance claims and insurance refunds in 1956 and 1958 in the respective amounts of $720 and $5,589. Associates received miscellaneous income in 1956 and 1959 in the total amount of $139.47. In November 1956, Kahn received a rebate of real estate taxes from the City of Camden, New Jersey, due *40 to a reduction of the tax on the Old Camden Forge property. The rebate check in the amount of $8,332.91 was payable to Herman Kahn and it was endorsed by him. The real estate tax rebate was not recorded on the books and records of Associates. In 1956 Condenser acquired from Kahn certain items of Old Camden Forge machinery and equipment which were shipped to Condenser's Hoboken office. In 1956 purchasers of Old Camden Forge machinery and equipment paid crane rentals to Associates in connection with the removal of such purchases. Associates recorded crane rentals on its books in the total amount of $5,382.50 for 1956. In 1958 the books of Associates showed income from miscellaneous sales of scrap in the amount of $2,350. In 1958, L. Blumberg & Sons purchased $45,000 of scrap from the Old Camden Forge premises. The proceeds of the $45,000 sale were not recorded on the books of Condenser or on the books of Associates. A second auction sale of machinery and equipment was conducted by Bernard Magrill at the premises of Old Camden Forge in 1958 and a total of $30,846 was realized at the sale. On April 10, 1956, the A. E. Petruss Company made three purchases at the auction in *41 the amounts of $2,850.03, $443.12, and $1,400. The checks given in payment of those amounts do not bear the stamped endorsement for the Camden Trust Company account which had been opened as a repository for the checks received at the auction. Kahn was the last endorser on all three checks which indicate they were cashed at the First National Bank of Jersey City, Hoboken office. On April 12, 1956, Kahn purchased five cashiers checks from the First National Bank of Jersey City, Hoboken office. Three of the cashiers checks were each in the amount of $12,500 and the remaining two were each in the amount of $6,250. All of the cashiers checks were purchased by Kahn through the negotiation of checks obtained from purchasers at the auction sale or at private sales. The five cashiers checks were deposited in the Associates bank account and the deposits were reflected on the books of Associates as a credit to the capital account. Some time prior to June 1957, an item of machinery called a Niles Lathe was sold by Associates to the Simmons Machine Tool Corporation for $7,500. Payment was made by two checks, one in the amount of $5,000 and the second in the amount of $2,500. The $5,000 check *42 bears the endorsement of H. Kahn & Associates but it was not reflected in any income account on the books and records of Associates. The $2,500 check was not deposited in the Associates bank account. In January 1957, Associates sold machinery and equipment to Midvale-Happenstall Company in the amount of $11,938.70. A check in that amount, made payable to H. Kahn and Associates, was endorsed by Kahn for H. Kahn and Associates and then endorsed by Kahn individually. The sales income of $11,938.70 was not recorded on the books and records of Associates. During the year 1957, Walter T. Quigley, the Condenser employee who was working at the Old Camden Forge premises, made sales (generally in cash) of various items in the total amount of $6,608.02. Quigley gave the sales proceeds to Grober on his weekly visits to Old Camden Forge and Grober in turn gave the proceeds to Kahn. These sales proceeds were not reflected in the income of Associates for the year 1957. Partnership returns for Associates were filed for the year 1956 (both an original and an amended return), 1957 and 1958. In the returns for 1956 and 1958, Kahn showed sales (in Schedule D) by Associates of machinery and equipment *43 (and structural steel in 1958) in the respective amounts of $396,931.85 and $96,131.05. The partnership return for 1957 showed gross receipts in the amount of $1,996. In both the original and amended partnership return for 1956, the sales of machinery and equipment are shown as sales of section 1231 assets, while in the 1958 partnership return, the sales are shown as sales of capital assets. In the original partnership return for 1956, the cost basis of the machinery and equipment is shown as $405,300, with accumulated depreciation in the amount of $28,668.78, expenses of sale in the amount of $20,048.50 and a gain in the amount of $252.13. In the amended partnership return for 1956, the accumulated depreciation was reduced to $21,236.50, with a realized loss shown in the amount of $7,180.05. In the partnership return for 1958, expenses of sales are shown as $1,400, with a gain of $94,731.05. The gain of $252.13 shown in the original 1956 partnership return was shown (in Schedule K) as distributable long-term capital gains to Herman Kahn, Gertrude Kahn, Maurice Grober, J. Brooks and M. Weintraub in the respective amounts of $63.04, $63.04, $63.03, $31.51 and $31.51. In the 1958 partnership *44 return, the gain of $94,731.05 is shown (in Schedule K) as distributable long-term capital gains to Herman Kahn, Gertrude Kahn, Maurice Grober, Alice Brooks and Carol Weintraub in the respective amounts of $23,682.77, $23,682.77, $23,682.77, $11,841.37 and $11,841.37, which amounts were also reported in their respective Federal income tax returns for the year 1958. The original partnership return for 1956 showed rental income of $39,382.50, refunds of $720, total deductions of $41,099.69 and a net loss of $997.19 which was shown in Schedule K as distributable to Herman Kahn, Gertrude Kahn, Maurice Grober, J. Brooks and M. Weintraub in the respective amounts of $249.30, $249.30, $249.30, $124.65 and $124.65. These losses were reflected in the respective Federal income tax returns filed by said individuals for the year 1956. The partnership return filed for 1957 showed gross receipts of $1,996, total deductions of $97,396.47 and a net loss of $95,400.47 which was shown in Schedule K as distributable to Herman Kahn, Gertrude Kahn, Maurice Grober, A. Brooks and C. Weintraub in the respective amounts of $23,850.13, $23,850.13, $23,850.13, $11,925.05 and $11,925.05. Losses in these amounts *45 were also shown in the respective Federal income tax returns filed by said individuals for the year 1957. The total deductions of $97,396.47 shown on the 1957 partnership return included the amount ($73,597.58) which had been charged by Condenser to Associates in connection with the services performed by Condenser on the Navy servicing contract. The partnership return for 1958 showed no gross income, total deductions of $68,533.24 and a net loss in that amount which was shown in Schedule K as distributable to Herman Kahn, Gertrude Kahn, Maurice Grober, A. Brooks and C. Weintraub in the respective amounts of $17,133.31, $17,133.31, $17,133.31, $8,566.66 and $8,566.66. These losses were also reported in the respective Federal income tax returns filed by said individuals for the year 1958. The partnership return for 1958 also showed a net longterm capital gain realized from the sale of machinery and structural steel in the amount of $94,731.05 which was shown in Schedule K as distributable to Herman Kahn, Gertrude Kahn, Maurice Grober, A. Brooks and C. Weintraub in the respective amounts of $23,682.77 $23,682.77, $23,682.77, $11,841.37 and $11,841.37. These long-term capital gains *46 were reported in the respective Federal income tax returns filed by said individuals for the year 1958. The total deductions of $68,533.24 shown on the 1958 partnership return included a deduction described as "claim settlement" for the amount of $18,000 which had been paid from the Associates bank account to the Navy for the release of the "dormant estate" clause in the 1940 agreement between the Navy and Old Camden Forge. During the course of an audit of the Associates partnership returns, the revenue agent was supplied with a purported copy of the agreement under which Associates was conducting its operations. This purported agreement, which was expressly prepared for the revenue agent, omitted a portion of the first numbered paragraph of the authentic agreement and omitted entirely the sixth numbered paragraph which made reference to Kahn's right to acquire the United States Navy buildings, machinery and equipment on the Old Camden Forge premises. The revenue agent was not informed about the Navy servicing contract. In the version of the agreement which was submitted to the revenue agent the first numbered paragraph stated in its entirety as follows: 1. Kahn hereby assigns *47 to Gertrude Kahn and Maurice W. Grober 25% each, and to Mrs. Carol Weintraub and Mrs. Alice Brooks 12-1/2% each, of the net profits to be realized upon a bona fide sale and liquidation to cash of the real estate, machinery, equipment and other personal property purchased by him in Camden, New Jersey, and as more particularly described above; and or lease or leases of the properties. The revenue agent's report dated March 1960, showed gross receipts by Associates in the total amounts of $723,185.21, $57,564.01 and $96,131.05 for the years 1956, 1957 and 1958, respectively, with the gains realized from the sale of machinery and equipment for the years 1956, 1957 and 1958 shown in the respective amounts of $479,244.91, $39,013.74 and $63,255.62. Neither Alice Brooks nor Carol Weintraub were allowed by the revenue agent as partners in Associates. However, he considered Grober to be a 25 percent partner in Associates and computed Grober's distributable share of partnership income or loss for the years 1956, 1957 and 1958 in the respective amounts of $120,291.45, ($13,523.18) and $3,380.71. Kahn paid the asserted deficiency in Grober's income taxes, approximately $39,000, which was attributable *48 to the above adjustments to Grober's income. Kahn made no distributions from Associates to Grober in the years 1956, 1957 and 1958, but Grober did receive a distribution of $5,500 in 1959 from Associates. Grober's employment with Condenser was terminated in January 1961. On February 21, 1961, Grober commenced an action against Kahn "for an accounting in a joint venture, for a partition of industrial real estate, and for incidental relief" in the Superior Court of New Jersey, Chancery Division, Essex County. The trial lasted for 84 days and over 700 exhibits were received in evidence. The Superior Court found in its opinion dated February 21, 1964, that the total reconstructed receipts of Associates for the period from October 6, 1955, to December 31, 1961, were in the amount of $1,766,375.08 computed as follows: Description
Amount
Total sales at first public auction
$449,477.50
Scrap and structural steel sold to
L. Blumberg's Sons, Inc.:
May 2, 1956 - First sale not recorded in joint venture books
$205,000.00
June 12, 1956-Second sale re- corded in joint venture books
35,000.00
Jan. 31, 1958-Structural steel sale not recorded in joint venture books 45,000.00 285,000.00
Known private sales
142,595.00
Total sales at second public auction
21,996.00
Sales of assets to Condenser Service & Engineering Co.
30,000.00
Value of assets sold to unknown purchasers or otherwise disposed of
195,000.00
Other income submitted herewith
413.00
Scrap sales to others
2,350.00
Sale of Woodlynne real estate
52,154.86
Rentals of property and equipment (from Condenser)
44,278.84
Charges for service of crane and other equipment
5,332.50
Insurance claims and refunds
6,309.00
Miscellaneous income
139.47
Tax refund from City of Camden
8,332.91
Investment by co-venturers
5,000.00
Borrowed from Consolidated Products Co. Inc. - To purchase real and personal properties
495,000.00
Advanced by H. Kahn - repaid later
1,000.00
Condenser Service & Engineering loan
20,000.00
Additional item representing proceeds ofNavy removal contract 1,996.00
Total Reconstructed Receipts
$1,766,375.08
*49 The Superior Court found disbursements of Associates during the period from October 6, 1955, to December 31, 1961, in the amount of $1,334,818.22 computed as follows: To Old Camden Forge - to acquire real and personal property
$ 500,000.00
To Consolidated - repayment of loan
495,000.00
To Condenser - repayment of loan
20,000.00
To co-venturers - distribution
22,000.00
To Kahn - repayment of loan
1,000.00
To Kahn and Grober - "Templates" proceeds
1,000.00
For expenses, refunds, etc. 177,794.23
$1,216,794.23
Acquisitions of Navy Building and Equipment:
To Camden Forge Division - for payroll, rigging, cleaning, preservation
73,597.85
To United States Treasurer - for purchase of building and equipment 44,426.14
$1,334,818.22
The Superior Court found total unaccounted joint venture funds during the period from October 6, 1955, to December 31, 1961, as follows: Total reconstructed receipts
$1,766,375.08
Less:
Disbursements and expenditures
$1,334,818.22
Balance in bank 156.26
1,334,974.48
Balance of unaccounted funds
$ 431,400.60
The Superior Court found under the "joint venture agreement" dated October 6, 1955, the *50 following interests were held in the "joint venture" assets: Grober, 25 percent; Herman Kahn, 25 percent; Gertrude Kahn, 25 percent; Alice Brooks, 12-1/2 percent; and Carol Weintraub, 12-1/2 percent. The Superior Court also found that Kahn was "liable to the joint venture in the sum of $432,400.60" with interest at 6 percent on a stated portion of that amount. A receiver for the Associates property was appointed by Court order of June 3, 1964, and creditors were limited to two months within which to present claims. Condenser and Consolidated filed total claims in excess of $1,250,000, which claims were disallowed by the receiver. The Court approved the report of the receiver and an adjudication, which is now final, held that the costs of services and removal contracts with the Navy ($73,597.85) were the only amounts due to Condenser. In 1967 the receiver was ordered to distribute to Grober the amount of $184,349.18 which represented 25 percent of the remaining profits from final liquidation of the Associates assets. From the above amount, the receiver paid $112,891.31 to Grober's attorney to cover fees and disbursements. In the statutory notice of deficiency in Docket No. 3860-67 (Kahn) *51 the respondent determined that the petitioners Herman Kahn and Gertrude Kahn understated their partnership income from Associates in the year 1956 by the amount of $454,231.23 computed as follows: Examination of the books and records of H. Kahn & Associates discloses that your share of the distributable income for the year 1956 is $450,142.61. Inasmuch as you reported a loss of $4,088.62, your taxable income has been increased by the difference of $454,231.23, computed as follows: Ordinary net income per amended partnership return (997.19)
Add: Unallowable deductions and additional income:
1. Gains on sale of machinery and equipment
$603,034.83
2. Rents
4,135.50
3. Real estate tax refund
8,332.91
4. Service income
1,996.00
5. Depreciation 12,048.10
629,547.34
Total
$628,550.15
Less: Nontaxable income and additional deductions:
6. Legal expense
9,150.00
7. Insurance expense 19,210.00
28,360.00
Corrected partnership ordinary net income $600,190.15
Your distributive share
$450,142.61
Partnership loss reported on your return 4,088.62
Understatement of partnership income $454,231.23 Respondent also determined that the petitioners(Kahn) *52 in Docket No. 3860-67 understated their partnership income in the years 1957 and 1958 in the respective amounts of $159,627.40 and $55,356.91 computed as follows: 1957
Ordinary net income per partnership return
($ 95,400.00)
Add: Unallowable deductions and additional income:
1. Gain on sale of machinery and equipment
$ 42,883.20
2. Rents
150.00
3. Other income
202,655.00
4. Depreciation 944.00
246,632.20
Total
$151,232.20
Less: Nontaxable income and additional deductions:
1. Service income 1,996.00
Corrected partnership ordinary net income $149,236.20
Kahn's distributive share
$111,927.15
Partnership loss reported on Kahn's return 47,700.25
Understatement of partnership income
$159,627.40
1958
Ordinary net income per partnership return
($ 68,533.24)
Add: Unallowable deductions and additional income:
1. Gain on sale of machinery and equipment
$ 42,079.19
2. Gain on sale of structural steel
30,000.00
3. Rents
185.00
4. Other income
5,589.00
5. Depreciation
800.44
6. Other deduction - claim settlement 18,000.00
96,653.63
Corrected partnership ordinary net income $ 28,120.39
Kahn's distributive share
$ 21,090.29
Partnership loss reported on Kahn's return 34,266.62
Understatment of partnership income
$ 55,356.91
*53 In the statutory notice of deficiency in Docket No. 980-67 (Grober), the respondent determined that the petitioners understated their partnership income from Associates in the years 1956, 1957 and 1958 in the respective amounts of $150,296.84, $61,159.17 and $24,163.41. Respondent also disallowed deductions for entertainment expenses claimed by petitioners in 1956, 1957 and 1958 in the respective amounts of $800, $1,500 and $1,500. Respondent also included in petitioners' income for 1956 the amount of $586.22 which purportedly represented personal expenditures of Maurice W. Grober which were reimbursed to him by Condenser. In the statutory notice of deficiency in Docket No. 3861-67 (Weintraub), the respondent determined that the petitioners understated their partnership income from Associates in the years 1956, 1957 and 1958 in the respective amounts of $76,045.93, $30,579.58 and $12,081.71. In the statutory notice of deficiency in Docket No. 3886-67 (Brooks), the respondent determined that the petitioners had understated their partnership income from Associates in the years 1956, 1957 and 1958 in the respective amounts of $76,045.93, $30,579.58 and $12,081.71. OPINION The *54 first issue is whether a joint venture taxable as a partnership was formed during the taxable years here involved to perform certain transactions centering upon the acquisition and ultimate disposition of the Old Camden Forge properties. It is the contention of the petitioner in Docket No. 3860-67 (Kahn) that the agreement of October 6, 1955 created a joint venture (Associates) consisting of Herman and Gertrude Kahn, their two daughters, Carol Weintraub and Alice Brooks, and Maurice W. Grober and that said individuals are taxable as partners on their respective distributive shares of the income earned by the joint venture in the years 1956, 1957 and 1958. Petitioner, Maurice W. Grober (Docket No. 980-67), contends that his role in the transactions which transpired during the years here involved was that of an employee rather than a member of a joint venture (which Grober maintains did not exist) and that consequently he is not taxable as a joint venturer for any portion of the income arising from the 1956- 1958 transactions. At the trial and on brief, the respondent basically supports the position of Maurice W. Grober, i.e., that no joint venture existed during the years here involved *55 and that any income generated by the transactions conducted under the name of Associates during this period is taxable to Kahn. [3]
*56 There is no merit in Kahn's threshold argument that, under the doctrine of collateral estoppel as set forth in Commissioner v. Sunnen, 333 U.S. 591 (1948), the judgment of the Superior Court of New Jersey in the successful accounting action brought by Grober against Kahn in 1961 is determinative for Federal tax purposes of the existence of a joint venture. Since respondent was not a party to the prior State action, one of the essential prerequisites for collateral estoppel is lacking. More fundamentally, however, it is clearly established that in determining whether or not a joint venture (or partnership) for Federal tax purposes exists we are not bound by the status of the parties under local law. Commissioner v. Tower, 327 U.S. 280 (1946). As noted by this Court in Hubert M. Luna, 42 T.C. 1067 (1964), "the Internal Revenue Code prescribes its own standards for qualification of an unincorporated association as a partnership and supersedes local law." Kahn also argues that under the holding of the Supreme Court in Commissioner v. Estate of Bosch, 387 U.S. 456 (1967), *57 the determination of the status of the parties in the New Jersey State court becomes binding for Federal tax purposes. We cannot agree. The rule of the Bosch case, i.e., that a Federal court is bound only by the decisions of the highest court of the State and need give only proper regard to the decisions of the State's trial courts and intermediate appellate courts which have authoritatively defined a particular taxpayer's rights or interests under State law, applies only when Federal tax consequences in fact turn upon a taxpayer's rights or property interests under State law. Such is not the situation here since, as we stated above, the question of whether or not a joint venture exists for Federal tax purposes must be decided under standards prescribed in the Internal Revenue Code and is not controlled by the determinations of a State court. [4]
*58 Section 7701(a)(2) provides that the "term 'partnership' includes a * * * joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on * * *; and the term 'partner' includes a member in such a * * * joint venture, or organization." See also section 761(a). A joint venture has been defined as a "special combination of two or more persons where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation" and "an association of persons to carry out a single business enterprise for profit." Beck Chemical Equipment Corporation, 27 T.C. 840, 848-849 (1957); Estate of L. O. Koen, 14 T.C. 1406, 1409 (1950); and Chase S. Osborn, 22 B.T.A. 935, 945 (1931). In Hubert M. Luna, 42 T.C. 1067, 1077 (1964), this Court noted that "[whether] parties have formed a joint venture is a question of fact to be determined by reference *59 to the same principles that govern the question of whether persons have formed a partnership which is to be accorded recognition for tax purposes." The Court then enumerated some of the factors, none of them conclusive, which have some bearing on the issue: * * * The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. *60 We are not persuaded that a joint venture existed during the years here involved. In reaching this conclusion, we have applied the various factors outlined above to the factual background of this case and we are left eith the distinct impression that Associates (the purported joint venture) was nothing more than an artificial device conceived by Kahn to fragmentize his anticipated profits from the Old Camden Forge transactions. Throughout this period, Kahn was in complete control of the books and records of Associates as well as the receipts from the auction sales, the various private sales, and the various transactions linked to the Old Camden Forge acquisition. No distributions were made by Associates to Grober in the years 1956, 1957 and 1958. Through a loan from his wholly-owned corporation (Consolidated), Kahn provided $495,000 of the $500,000 purchase price for the Old Camden Forge properties, with Grober providing a token amount of $1,250 and the balance provided by Kahn's wife and two daughters. Grober was under no obligation to share losses of the purported joint venture. Although Associates filed partnership returns for the years 1956, 1957 and 1958, it is significant that, *61 following an audit by the Internal Revenue Service in 1960 of Associates' partnership returns which resulted in substantial adjustments in the income of Associates and corresponding adjustments in the income of Grober who was considered by the revenue agent to be a 25 percent partner, Kahn paid the resulting deficiency in income taxes which was asserted against Grober as a result of the adjustments made in Associates' income. Kahn exercised firm control over the liquidation of the Old Camden Forge assets. The main auction sale of Old Camden Forge machinery and equipment in April 1956 was conducted by Bernard Magrill who had performed similar auctioneering duties over the years for Kahn's wholly-owned corporation, Consolidated. Kahn's nephew, Gilbert, who had been employed by Consolidated and had extensive experience in the sale of used machinery and equipment, was placed by Kahn in charge of the machinery and equipment sales at the Old Camden Forge plant. Grober had been employed by Condenser since 1943 and was the corporation's vice president in charge of all operations when Condenser was acquired in 1953 by Consolidated, Kahn's wholly-owned corporation. Kahn had prevailed upon *62 Grober to remain with Condenser. In 1955 Grober learned that Old Camden Forge was anxious to sell its properties and, unable financially to undertake the transaction himself, Grober brought the proposition (with its evident profit potential) to Kahn's attention. Old Camden Forge had certain outstanding contractual obligations with the United States Navy and in the ensuing negotiations with Kahn, Old Camden Forge informed him that its properties could not be sold without some satisfactory arrangement for the completion of the substantial work in progress. It was agreed that Condenser would complete the work in progress under Grober's direction. Kahn thereupon purchased the plant and equipment of Old Camden Forge with the intention of liquidating such assets as soon as Condenser had completed Old Camden Forge's work in progress. It is quite evident, we believe, that Grober's role in the events that began in 1955 with Kahn's acquisition of the Old Camden Forge properties was that of a key employee in a position to render valuable services. Realistically viewed, the contingent compensation which Kahn agreed to pay Grober was in evident recognition of said services and, in all probability, *63 in recognition as well of Grober's role in bringing the Old Camden Forge offer to Kahn's attention. Such an interpretation, we believe, more accurately defines the true intent of the parties as gleaned from the entire record. We conclude that Kahn and Grober were not joint venturers or partners during the years here involved. Kahn's argument understandably focuses upon Grober's activities in the attempt to establish the existence of a valid partnership. The argument made by Kahn that his wife and two daughters were similarly partners or joint venturers in Associates does not require extended discussion. Apart from their token contributions in 1955 ($1,250 from Kahn's wife and $675 from each of his two daughters), there is absolutely no indication in the record that they performed any services or functions in connection with the activities of Associates. The various factors discussed above in connection with Grober's status in the purported joint venture are equally applicable here. Even if we should assume that Associates was in fact a valid partnership or joint venture during the years before us, we would hardly consider the nominal contributions made by these parties under the *64 circumstances revealed by this record as sufficient to constitute them as partners within the meaning of section 704(e). We are not persuaded under the facts and circumstances of this case that Kahn's wife and two daughters were the real owners of capital interests in the partnership or were bona fide partners or co-venturers with Kahn in the transactions here under consideration. In reaching our ultimate conclusion, we have considered the effect of the notes which were ostensibly given by Associates to Consolidated in October 1955 to evidence the $495,000 borrowed by Associates to finance the acquisition of the Old Camden Forge properties in 1955. We do not see how these notes by themselves can somehow serve as a life-giving elixir for the entity called Associates. Since we have already found that Associates did not constitute a valid joint venture or partnership, the existence of these notes evidencing a loan to Kahn from his wholly-owned corporation is without any significance. The next issue is whether the gains realized by Kahn from the sales of machinery, equipment and other items during the years here involved were derived from the sale or exchange of capital assets within *65 the meaning of sections 1221 and 1231 and therefore taxable as capital gain, or were derived from the sale of property held for sale to customers in the ordinary course of a trade or business and therefore taxable as ordinary income. [5]
Under the provisions of section 1221(1) "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" is excluded from the category of capital assets. In Malat v. Riddell, 383 U.S. 569 (1966), the Supreme Court held that the statutory word "primarily" as employed in section 1221(1) means "of first importance" or "principally" and then went on to state that "[the] purpose of the statutory provision with which we deal is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand ( Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52 (1955), and 'the realization of appreciation in value accrued over a *66 substantial period of time' on the other. ( Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 134 (1960)." Among the criteria adopted by the Courts in determining the factual question posed here, the taxpayer's purpose in acquiring and in disposing of the property, the continuity of sales or sales related activity over a period of time, the number and frequency of sales, the substantiality of sales, and the extent to which the taxpayer or his agents engaged in sales activities by developing or improving the property, soliciting customers and advertising. Mauldin v. Commissioner, 195 F.2d 714 (C.A. 10, 1952); W. T. Thrift, Sr., 15 T.C. 366 (1950). Although the purpose for which the property was acquired is of some weight, the end question is the purpose of the holding at the time of the dale. S.O. Bynum, 46 T.C. 295 (1966). Consolidated, which was wholly-owned by Kahn, had been engaged for many years in the business of acquiring entire plants for liquidation. In dealing with the present issue, however, we have focused *67 our attention only upon the activities of Kahn and his agents in connection with their disposition of the Old Camden Forge properties and have not attributed the business activities of the corporate entity to Kahn in his individual capacity. See Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). We believe the record as a whole fairly indicates that Kahn's only purpose in acquiring the Old Camden Forge properties in October 1955 was to sell them as soon as the existing work in progress was finished. It was contemplated that such work could be finished in four or five months. Kahn placed his nephew, Gilbert Kahn, in charge of the sale of machinery and equipment at the Old Camden Forge plant. Gilbert had extensive experience in the sale of used machinery and equipment while in the employ of Consolidated since 1932. Some two or three months prior to the April 1966 auction sale, an advertising campaign was launched in various trade journals and in the New York Times. About 10,000 circulars and about 5,000 letters advertising the sale were mailed to potential customers such as machinery dealers, scrap dealers and oil refineries. In preparation for the sale, the *68 machinery and equipment was dismantled, cleaned, moved and tagged and the individual items of equipment were prepared for display. An auctioneer was retained for the actual conduct of the auction sale which took place on April 10 and 11, 1956. Some 1,100 individual lots of machinery and equipment were sold and a total of $447,577.50 was realized from the auction sale. Gilbert Kahn remained at the Old Camden Forge plant with a staff through the remainder of 1956 and made private sales. In 1957 and 1958 private sales of machinery and equipment, including scrap, were continued under one Walter T. Quigly who sent the sales proceeds directly or indirectly to Kahn. We are convinced that the above enumerated activities of Kahn and his agents in their concentrated and highly professional efforts to sell the machinery, equipment and scrap at the Old Camden Forge plant amounted to the carrying on of a business and the sales were to customers in the ordinary course of that business. We therefore find, and so hold, that Kahn held the property here involved primarily for sale to customers in the ordinary course of his trade or business and that the gains realized from the sales of such property *69 during the years here involved are taxable as ordinary income. Kahn has argued in the alternative that he is entitled to capital gains treatment under section 1231(a) which states generally that gains on sales or exchanges of "property used in the trade or business" shall be accorded capital gains treatment. Subsection 1231(b)(1)(B), however, excludes from the term "property used in the trade or business" any property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, which exclusionary language is also found in section 1221(1). Consequently, our finding above which precludes the application of section 1221(1) under the facts of this case is also instrumental in precluding the application of section 1231. The next issue is whether the sales of scrap from the Old Camden Forge premises in 1956 and 1958 in the respective amount of $205,000 and $45,000 represented income taxable to Associates, as respondent argues, or constituted income taxable to Condenser. Both the 1956 and the 1958 sales were made to L. Blumberg and Sons. Payment for the May 2, 1956 sale was by certified check payable to Bernard Magrill, the auctioneer who had been *70 employed by Kahn to conduct the auction sales on the Old Camden Forge premises. The amount of the sale was recorded on Condenser's books as a debit to cash and a credit to notes payable as a loan from Kahn and Grober. It was not reflected in any income account of Condenser and it did not appear on the books of Associates. Condenser's public accountants later made inquiries about the $205,000 on the books of Condenser and in response to such inquiries they were shown two documents prepared on the stationery of Bernard Magrill indicating that the $205,000 represented auction sales made on April 10, 1956 for the account of Associates and that none of the sales included in that amount were made on behalf of Condenser. Now, in a further reversal, Kahn says that it was Condenser's income all the time. We do not believe the facts support the argument made here that the income belonged to Condenser. It is not possible to infer on the basis of this record that the scrap sold in 1956 and later all came from the work in process that Condenser had undertaken to complete at the Old Camden Forge premises. Even if we should accept the possibility that Condenser, in completing the work in process, *71 was left with salable scrap, such scrap could readily be accounted for by the later scrap sale on or about June 8, 1956 in the amount of $125,000 which was allocated between Condenser and Associates in the respective amounts of $90,000 and $35,000. These amounts, contrary to the prior scrap sales, were reflected in the income accounts of Condenser and Associates and it would seem that the different treatment contemporaneously accorded the May scrap sales and the June scrap sales more accurately reflects the realities of the transactions. These same considerations apply to the 1958 scrap sale from the Old Camden Forge premises in the amount of $45,000, which amount was not recorded on the books of either Condenser or Associates. Since it appear that the unfinished work in progress was finished by Condenser within a period of a few months, it is even more implausible that the scrap sold in 1958 was generated by such work in the earlier years. We hold, on the basis of the whole record, that the disputed scrap sales in 1956 and 1958 represented income to Associates. The next issue is a similar one, i.e., whether the income from the Navy servicing contract in the amount of $202,655 was *72 taxable in 1957 to Condenser or to Associates. We have outlined in our findings of fact the contractual relations beginning on December 30, 1940 between Old Camden Forge and the United States Navy and leading up to the novation agreement executed by the United States Navy, Old Camden Forge and Kahn on October 19, 1956 (effective as of October 6, 1955) whereby Kahn individually acquired all rights to the Navy facilities on the Old Camden Forge premises and succeeded to all obligations under the servicing contract, which stated a formula for compensation to be paid by the United States Government in connection with the removal, cleaning and shipment of Navy equipment. We have concluded that the income from the Navy servicing contract is taxable to Associates. After the novation agreement, Kahn continued to act for the most part in his individual capacity in matters touching upon the servicing contract. Throughout 1957 he individually billed the Navy for services performed under the contract. The actual work under the servicing contract was performed by Condenser at cost and, under this arrangement, Condenser charged Associates $73,597.58 in 1957. None of the billings to the Navy under *73 the servicing contract were reflected on the books of Associates. In 1958 Kahn acquired title to the Navy facilities at Old Camden Forge and in payment for said facilities cancelled the amounts due from the Navy under the servicing contract. On this record we are unable to find any factual nexus between Condenser and the servicing contract which could support the argument that it, rather than Kahn, was entitled to the income arising under such contract. The next issue is whether any part of the underpayment of tax in Docket No. 3860-67 (Kahn) in each of the years 1956, 1957 and 1958 is due to fraud within the meaning of section 6653(b). Respondent has the burden of proving fraud by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751 (1950). Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intentions. In Spies v. United States, 317 U.S. 492 (1943), the Supreme Court indicated that an affirmative willful attempt to evade tax "may be inferred rom conduct such as keeping a double set of books, making false entries *74 or alterations, or false invoice or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in the transactions of this kind, and any conduct, the likely effect of which would be to mislead or to conceal." Our conclusion must be based upon all of the evidence in the record and inferences properly drawn therefrom. Jacob C. Ehrlich, 31 T.C. 536 (1958). With these considerations in mind, we have carefully considered the entire record and conclude that respondent has met his burden. Kahn understated the sales of machinery and equipment on the Associates partnership return filed for 1956 by at least $50,000 and it appears most of the understatement was deliberate. Checks issued by the A. E. Petruss Company for three purchases at the auction on April 10, 1956 in the total amount of $4,693.15 were diverted by Kahn from the bank account which had been established for the specific purpose of depositing auction sale proceeds. On April 12, 1956, Kahn converted checks received from purchasers at the auction sale or at private sales into five cashiers checks totaling $50,000. *75 The cashiers checks were reflected on the books of Associates as a credit to the capital account. In addition to understated sales, the record shows that a rebate of real estate taxes in November 1956 (due to a reduction of the tax on the Old Camden Forge property) from the city of Camden, New Jersey payable to Kahn in the amount of $8,332.91 was not recorded on the books of Associates. Finally, the evidence portrays the effort by Kahn to disguise the scrap sales of $205,000 in 1956, first as a loan to Condenser and, after inquiries by Condenser's public accountants as part of the April 10, 1956 auction sale conducted by Associates. Actually, the scrap sale of $205,000 was never reflected in an income account on the books of Associates. The 1957 information return filed by Kahn for Associates showsgross receipts of only $1,996 yet the evidence clearly established sales in significant amounts of machinery and equipment, as well as other items, from the Old Camden Forge premises. These unreported sales include the sale of a Niles Lathe for $7,500, machinery and equipment to Midvale-Happenstall Company in the amount of $11,938.70, and sales proceeds of $6,608.02 transmitted directly *76 or indirectly to Kahn by his employees from the Old Camden Forge premises. Finally, the evidence shows that Kahn failed to report any of the Navy receipts under the servicing contract which the records clearly indicate incurred to him. In 1958 the scrap sales of $45,000 to L. Blumberg & Sons were not reflected on the books of Associates. Moreover, the revenue agent conducting an audit of the Associates partnership returns for the years 1956, 1957 and 1958 was supplied with a truncated copy of the original agreement under which Associates was operating. The false copy omitted all references to Kahn's right to acquire the Navy buildings. Since it appears that Kahn ultimately acquired these Navy facilities by cancelling the unreported amounts due him from the Navy under the servicing contract, the reason for deleting all references to the Navy buildings was obviously to prevent the revenue agent from discovering the existence of the unreported income from the Navy servicing contract. We believe the record as a whole amply demonstrates a continuing pattern during the years 1956, 1957 and 1958 of efforts on the part of Kahn to conceal income from the various transactions which took *77 place over the three year period before us. We conclude and hold that a part of the underpayment in tax in Docket No. 3860-67 in each of the years 1956, 1957 and 1958 was due to fraud within the meaning of section 6653(b). [6]
The next issue is whether the petitioner in Docket No. 980-67 (Grober) is entitled to deduct entertainment expenses in 1956, 1957 and 1958 in the respective amounts of $800, $1,500 and $1,500 as business expenses under section 162(a). Grober was an executive of Condenser during this period. He testified that he was normally reimbursed by Condenser for expenses incurred by him on company business. However, it appears that most of the expenses in issue represented entertainment at Grober's home and Condenser explicitly refused to reimburse him for such expenses. It is obvious on this record that Condenser had no policy requiring or expecting its executives *78 to incur such expenses. Moreover, the evidence clearly establishes the predominantly social nature of the entertainment and we are not persuaded that the expenses incurred were proximately related to Grober's trade or business of being a corporate executive. Noland v. Commissioner, 269 F.2d 108 (C.A. 4, 1959), affirming a Memorandum Opinion of this Court. We might also point out that a corporation and its executive officers are different entities and consequently, for purposes of section 162(a), the business of the corporation cannot be considered as the business of its officers. Burnet v. Clark, 287 U.S. 410 (1932). Respondent also determined that the petitioner in Docket No. 980-67 (Grober) had additional income of $586.22 in 1956, apparently on the ground that Grober had been reimbursed by Condenser for a personal expense. There is no dispute that the expense was purely personal, i.e., travel expenses for Grober's daughter and son-in-law. Grober testified that he in fact eliminated this item from the reimbursable schedule of expenses that he submitted to Condenser *79 in 1956. While the record is not entirely satisfactory on this issue, we feel that petitioner Grober has met his burden and consequently, we hold that the amount of $586.22 is not includable in his 1956 income. Respondent made several adjustments to income in Docket Nos. 3861-67 (Weintraub) and 3886-67 (Brooks) for the years here involved. Our findings in the several issues discussed above in the cases involving Kahn and Grober are equally applicable here. In addition, several miscellaneous adjustments were made by the respondent in Docket Nos. 3861-67 and 3886-67 which concern only those two dockets. Petitioner Brooks and Weintraub offered no evidence to meet their burden of proof of showing error in respondent's determination. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners have been consolidated herewith: HERMAN KAHN and GERTRUDE KAHN, docket No. 3860-67; MONROE J. WEINTRAUB and CAROL WEINTRAUB, docket No. 3861-67; and JOSEPH E. BROOKS and ALICE K. BROOKS, docket No. 3886-67.↩
2. All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. Respondent in his statutory notices of deficiency originally determined that Kahn and Grober were owners of a 75 percent interest and a 25 percent interest, respectively, in Associates and that they were taxable on the corresponding percentages of Associates' income in 1956, 1957 and 1958. (Docket Nos. 980-67 and 3880-67) Respondent also determined in the statutory notices of deficiency in Docket Nos. 3861-67 and 3886-67 that Kahn's two daughters were each owners of a one-eighth interest in Associates and therefore taxable on a corresponding portion of Associates' income during the years here involved. In an amended answer filed in Docket No. 3860-67 (Kahn), the respondent claimed additional income tax deficiencies in each of the years 1956, 1957 and 1958 based upon the determination that Associates was operated during this entire period by Kahn as a sole proprietorship (rather than as a joint venture) and that, consequently, Kahn was chargeable for all of the income earned by Associates during these years. We recognize that respondent has the burden of proof on these increased deficiencies claimed by him in the amended answer.↩
4. It should also be pointed out that the highest court of the State of New Jersey did not actually make any finding that a joint venture in fact existed between Grober and Kahn. The appeal to the Supreme Court of New Jersey involved the allowance to Grober of counsel fees and expenses. Grober v. Kahn, 47 N.J. 135, 219 A.2d 601↩ (1966). In holding that Grober was not entitled to counsel fees and expenses, the Supreme Court stated that whether the arrangement of the parties was a joint venture was "debatable but really of no moment." In fact, the Supreme Court in its opinion seems to throw some doubt as to whether the status of the parties was that of joint venturers.
5. In the subsequent portions of the opinion, Associates will generally be considered as the alter ego of Kahn.↩
6. Respondent has conceded in his reply brief that under the provisions of section 6653(b) as amended, there are no additions to tax due under that section from petitioner Gertrude Kahn (Docket No. 3860-67) by reason of her filing joint returns with her husband, Herman Kahn, in the years here involved.↩